COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOHN W. HOVORKA, M.D., | § | |
| | | No. 08-06-00209-CV |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 394th District Court |
| COMMUNITY HEALTH SYSTEMS, | § | |
| INC., BIG BEND HOSPITAL | | of Brewster County, Texas |
| CORPORATION D/B/A BIG BEND | § | |
| REGIONAL MEDICAL CENTER, AND | | (TC#2000-02-B7474) |
| BIG BEND REGIONAL HOSPITAL | § | |
| DISTRICT, | | |
| | | |
| Appellees. | | |

**O P I N I O N**

Appellant, John W. Hovorka, M.D., appeals the trial court's grant of partial summary judgment in favor of Appellees, Community Health Systems, Inc. ("CHS"), Big Bend Hospital Corporation d/b/a Big Bend Regional Medical Center (the "Hospital"), and Big Bend Regional Hospital District, on their breach of contract counterclaims. Hovorka also appeals the jury's verdict against him on his fraud claim. We affirm the judgment of the trial court.

## I. BACKGROUND

The Hospital is a fifty-bed general acute-care hospital in Alpine, Texas, which is owned and operated by Big Bend Regional Hospital District (the "District"). In 1997, the District and Big Bend Hospital Corporation (the "Corporation"), a subsidiary of CHS, entered into a Management Agreement and a Development Agreement. Under the Management Agreement, the District contracted to operate and manage the Hospital. Under the Development Agreement, the Corporation agreed to construct and operate a new general acute-care hospital for the District, and the District

agreed to lease the Hospital and assign its operation to the Corporation for a term of thirty years.

Mary Ann Smokler, an employee of a CHS subsidiary, worked as a consultant to the District for the recruitment of a general surgeon to the medical staff of the Hospital. Smokler received information regarding Hovorka from a recruiting firm and sent it to the Hospital. Hovorka, a medical doctor, was near completion of his residency training in Kansas City, Missouri. In March 1999, Hovorka and his fiancée, Wendy DeHoff, visited Alpine to meet with some of the local doctors and hospital administrators and to tour the hospital. Hovorka and DeHoff were informed that a new hospital was being constructed.

Subsequent to Hovorka's visit, Smokler's office prepared a letter and contract for Hovorka. The letter and contract were a standard agreement that Smokler used. Smokler forwarded the letter to the Hospital, which then sent it to Hovorka.

The letter, dated March 17, 1999, offered a general surgeon position to Hovorka. Hovorka and DeHoff reviewed and discussed the letter. Hovorka executed the proposed agreement (the "Agreement") on March 23, 1999, and returned it to the Hospital.

The Agreement was for a three-year term, to begin on August 1, 1999. Among other things, Hovorka agreed to engage in the private practice of medicine in Alpine, within a reasonable distance from the Hospital, beginning on August 1, 1999. The Hospital agreed to guarantee Hovorka cash collections of $29,167 per month for the first year of the Agreement. It was agreed that this monthly payment would be offset by any amount Hovorka collected during each month. For each month that Hovorka remained in practice in Alpine after this period, the Hospital would forgive 1/24th of the amount paid. The Agreement also provided that, if Hovorka ceased to practice general surgery full-time in Alpine during the term of the Agreement, Hovorka would reimburse the Hospital for any

2

amount that it had paid him. Among the statements contained in the letter is the following:

> You recognize that Hospital is a convenient acute care medical facility for the majority of patients likely to utilize your services for medical treatment and that the Hospital is duly accredited by the Joint Commission on Accreditation of Healthcare Organizations and is qualified for participation in the Medicare and Medicaid programs, and has excellent facilities and treatment capabilities.

According to Hovorka, Smokler told him either the day he executed the Agreement, or the prior day, that the Hospital was accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). Hovorka maintained that Don Edd Green, the Hospital's Chief Executive Officer, told him on his initial visit in March of 1999 that JCAHO reviewers were coming to review the Hospital for accreditation and subsequently told him over the telephone that the Hospital was JCAHO accredited. However, in May 1999, Hovorka learned that the Hospital was not JCAHO accredited. Hovorka claimed that he attempted to talk with Green about the lack of accreditation on several occasions, but that Green refused to talk about it. Hovorka was told by another Hospital administrator, as well as by the chief nursing officer, that JCAHO accreditation would be done. However, the lack of accreditation did not concern Hovorka, because he believed that lapsed accreditation was very common in rural hospitals.

The new hospital facility was completed and opened in October 1999. The new facility became JCAHO accredited in 2001. The Hospital was qualified to participate in Medicare and Medicaid at the old facility. The new facility was not qualified for Medicare and Medicaid until February 3, 2000. The lack of certification did not prevent physicians from admitting and treating patients at the new facility and did not prevent physicians from being paid by Medicare and Medicaid. Although he was aware that the Hospital did not have JCAHO accreditation and that the new location of the Hospital was not immediately certified for Medicare or Medicaid when it

3

opened, Hovorka did not ask to be let out of the Agreement.

Before he began practicing at the Hospital, Hovorka and his wife[1] decided to purchase a house in Alpine. Hovorka requested an advance of $35,000 from the amount guaranteed in the Agreement, in order to make a down payment. Hovorka and the Hospital executed an amendment to the Agreement to this effect, dated June 2, 1999. The Hovorkas moved to Alpine in July 1999 and Hovorka began performing services pursuant to the Agreement. Hovorka moved into an office located in a building leased by another doctor. The office had to be wired in order to get telephone service. According to Hovorka, this took approximately six weeks. In November 1999, Hovorka moved his office into a triple-wide trailer located behind the new location of the Hospital.

Business was very slow during the first few months of Hovorka's practice, because he had few patients. The Hospital brought in Connie Voltz to assist Hovorka to develop his practice. Voltz recommended that Hovorka get involved in the community. He attempted to do so by joining the Kiwanis Club. Nevertheless, Hovorka's practice remained slow during his time in Alpine.

On November 18, 1999, Dr. David Sanchez, the Chief of the Medical Staff, suspended Hovorka's privileges to perform laparoscopic cholecystectomies (gallbladder removal), after a member of the Hospital's Medical Executive Committee voiced concerns about three laparoscopic cholecystectomies performed by Hovorka, each of which resulted in complications for the patients. At a meeting concerning the matter two days later, Hovorka voluntarily relinquished his privileges to perform the procedure.

Hovorka resigned his position with the Hospital by a letter dated January 27, 2000. He

---

[1] Hovorka and DeHoff were married on June 20, 1999.

4

accepted a position at Spohn Hospital, located in Alice, Texas,[2] and closed his practice in Alpine in February of 2000. Hovorka testified that he understood the Agreement's requirement that he stay in Alpine for three years and that, if he failed to do so, he was obligated to repay all payments made to him. It is undisputed that Hovorka did not stay for the three-year term.

Hovorka filed his original petition on February 8, 2000. In it, he alleged that the Hospital and CHS misrepresented that it was JCAHO accredited and Medicare and Medicaid certified. Hovorka also alleged that, before he executed the Agreement, the Hospital and CHS promised $2,000,000 in new equipment for the operating room, but did not perform. Hovorka also alleged that he was promised locum tenens coverage for the time that he would be absent from the Hospital in order to take the American Board of Surgery reviews and exams. Based on these allegations, Hovorka brought claims for breach of contract and fraud and sought recovery in quantum meruit. In addition, Hovorka sought damages for mental anguish, exemplary damages, and attorney's fees. Hovorka attached a copy of the Agreement to his petition. Hovorka later amended his petition to add claims for negligent misrepresentation and conspiracy.

The Hospital counterclaimed for breach of contract, alleging that Hovorka breached the Agreement by failing to maintain his full-time practice of medicine and his residency in Alpine for the duration of the three-year term of the Agreement.

The Hospital moved for summary judgment on its counterclaim, which the trial court granted on September 5, 2002. The trial court ordered that the Hospital recover the sum of $158,884.60 in actual damages, prejudgment interest in the amount of $22,670.44, post-judgment interest, and attorney's fees in the amount of $16,000.

---

[2] Alice is located several hundred miles southeast of Alpine.

A three-day jury trial was held on Hovorka's fraud claim. Hovorka did not attend the trial, but his deposition was read into the record. The jury returned a verdict in favor of the Hospital and CHS. The trial court entered a final judgment incorporating the previous summary judgment and ordering that Hovorka take nothing by his claims. On appeal, Hovorka argues that the trial court erred in granting partial summary judgment in favor of the Hospital and CHS, because there was a genuine issue of material fact as to whether the Hospital and CHS committed prior material breaches of the Agreement. Hovorka also argues on appeal that the trial court committed reversible error by applying an incorrect definition of ratification of fraud in the jury charge.

## II. DISCUSSION

### A. Issue One

We review the trial court's grant of summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The standard of review for a traditional summary judgment asks whether the movant carried the burden of showing that there is no genuine issue of material fact, so that judgment should be granted as a matter of law. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). "An appellate court reviewing a summary judgment must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007). When reviewing a summary judgment, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Id.* at 755.

6

A plaintiff[3] moving for summary judgment must prove that it is entitled to summary judgment as a matter of law on each element of its cause of action. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). If a plaintiff fails to establish all the elements necessary to its cause of action, summary judgment is improper. *Collins v. County of El Paso*, 954 S.W.2d 137, 145 (Tex. App.--El Paso 1997, pet. denied) (citing *Wesson v. Jefferson Sav. & Loan Ass'n*, 641 S.W.2d 903, 906 (Tex. 1982)). A motion for summary judgment must expressly present the grounds upon which it is made, and it must stand or fall on these grounds. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). Issues which were not expressly presented to the trial court by written motion for summary judgment or response thereto cannot be considered as grounds for reversal. *Id.* Once the movant establishes a right to judgment as a matter of law, the burden shifts to the nonmovant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979).

The elements of a cause of action for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.--El Paso 2000, no pet.). On appeal, Hovorka contends that he presented summary judgment evidence as to the elements of breach and damages that precluded summary judgment.

Whether a party's conduct constitutes a breach of contract is a question of law. *See E.P. Towne Center Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex. App.--El Paso 2007,

---

[3] Appellees stood in the capacity of plaintiffs on their counterclaim on which partial summary judgment was granted.

no pet.). A fact question exists to the extent that there is a dispute as to a party's performance. *Id.* at 123-24. "A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994). "[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense that must be affirmatively pleaded." *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 852 (Tex. App.--Dallas 2005, pet. denied). If the party opposing summary judgment relies on an affirmative defense, he must present summary judgment evidence sufficient to raise a fact issue on each element of the defense to avoid summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Parker v. Dodge*, 98 S.W.3d 297, 300 (Tex. App.--Houston [1st Dist.] 2003, no pet.).

In their motion for summary judgment, the Hospital argued that the Agreement provided that, if Hovorka ceased practicing medicine in Alpine during the term of the contract, he was required to repay and reimburse the Hospital for all payments made to him, and that he breached the Agreement by failing to do so. The Hospital argued that, following all just and lawful set-offs, Hovorka had been paid $158,884.60. As summary judgment proof, the Hospital attached an affidavit by David Conejo, the chief executive officer of the Hospital. Conejo stated that Hovorka did not maintain his medical practice in Alpine for the period required by the Agreement; that, after all offsets, Hovorka had been paid the foregoing sum; and that he had not repaid any of this amount. Conejo attached the Agreement and the June 2, 1999, addendum to his affidavit. The Hospital also attached the affidavit of its attorney, who presented evidence concerning the amount of attorney's fees that it had incurred.

8

Finally, the Hospital also attached portions of Hovorka's deposition, in which he admitted having submitted his resignation, having closed his practice in Alpine on February 11, 2000, and having moved to Alice a few days later. The Hospital also attached an excerpt of Hovorka's deposition in which he admitted without qualification that he did not stay in Alpine for three years and that he had not reimbursed any of the amount that he was paid by the Hospital.

Hovorka filed a response to the motion, along with two supplemental responses. He argued that he was excused from performing, because the Hospital had committed prior material breaches of the Agreement. According to Hovorka, those breaches were: (1) the Hospital was not JCAHO accredited; (2) the Hospital was not qualified to participate in Medicare and Medicaid programs beginning in October 1999; (3) the Hospital failed to provide two million dollars in medical equipment for the operating room; (4) the Hospital did not provide locum tenens coverage for Hovorka during the time he was absent in order to take the American Board of Surgery reviews and exams; and (5) the Hospital promised him an office and did not provide one.[4]

On appeal, Hovorka contends that this evidence raised a genuine issue of material fact as to whether the Hospital and CHS committed prior material breaches of contract, such that Hovorka was excused from performance of the Agreement. The Hospital and CHS respond that the purported obligations concerning JCAHO accreditation, Medicare and Medicaid certification, the provision of two million dollars in operating room equipment, and the provision of an office space were simply not part of the Agreement, and that, even if they were, they were not material provisions of the Agreement.

---

[4] The trial court's order granting summary judgment does not state the specific ground or grounds upon which it relied for the ruling. In such a case, summary judgment will be affirmed on appeal, if any of the theories advanced is meritorious. *See Sotelo v. Interstate Fin. Corp.*, 224 S.W.3d 517, 520 (Tex. App.--El Paso 2007, no pet.).

The purported promises on the part of the Hospital and CHS as to office space and two million dollars in operating room equipment do not appear anywhere in the Agreement. Hovorka did not allege that there was any contract other than the Agreement, which Hovorka attached as an exhibit to his petition. Nor did Hovorka allege in his pleadings the existence of an Agreement subsequent to, or in addition to, the Agreement on this subject. Accordingly, there was no genuine issue of material fact as to these alleged promises.

The Hospital argues that the representations concerning JCAHO accreditation and Medicare and Medicaid qualification, although appearing in the Agreement, are akin to recitals and are not promissory obligations on the part of the Hospital and hence are not part of the Agreement. A "recital" is a formal statement, in any deed or writing, that is used to explain the reasons upon which the transaction is based. *Angell v. Bailey*, 225 S.W.3d 834, 842 (Tex. App.--El Paso 2007, no pet.). The statement at issue does not explain the basis for the transaction, but is instead a representation concerning certain qualifications and characteristics of the Hospital. We cannot say that this is not part of the contract between the parties.

In the alternative, the Hospital and CHS contend that, even if they form a part of the Agreement, a breach of such obligations could not result in a material breach of the Agreement, as the benefit of the bargain for Hovorka was the monthly guarantee payments by the Hospital. The Hospital and CHS also argued that Hovorka produced no summary judgment evidence that the alleged breaches damaged him.

Hovorka's summary judgment evidence concerning JCAHO accreditation and Medicare and Medicaid certification consisted of his affidavit in which he stated that the Hospital and CHS had represented to him that the Hospital was JCAHO accredited and qualified to participate in Medicare

and Medicaid; that Don Edd Green, then the Hospital's CEO, and Mary Ann Smokler of CHS, made these representations; and that he entered into the Agreement in reliance on these representations. Hovorka further stated that the Hospital was neither JCAHO accredited nor qualified for Medicare and Medicaid on the day he closed his practice in Alpine. Hovorka also submitted excerpts from his deposition and those of Smokler and David Conejo, in which Smokler and Conejo admit that neither the old Hospital nor the new one was JCAHO accredited. The excerpts also contain testimony by Conejo that the new location of the Hospital received its Medicare and Medicaid certification on February 3, 2000.

As evidence of damages, Hovorka presented the following excerpts of his deposition:

Q: Okay. How did the lack of Medicare/Medicaid certification affect your practice?

A: Well, there's a certain amount of goodwill in the community that if the hospital has trouble getting certified, maybe there is a problem with it, and the other problem that it has is -- or that I would have with it is if it's not certified, what are the problems with getting it certified.

Q: Do you know of any patients who didn't come to the hospital because of the lack of Medicaid certification?

A: Yes, sir.

Q: And how many patients?

A: Well, all my neighbors, for one.

Q: Okay.

A: None of them would go.

Q: How many would that be?

A: Well, at least a dozen.

Q: Okay. And how many people would not go to the facility because it didn't have

11

JACHO [sic] accreditation, to your knowledge?

A: A lot.

Q: Do you have any estimate?

A: 60 percent of the service area.

Hovorka also presented the following deposition excerpt in one of his supplemental responses:

Q: Other than the -- you told me hundreds of patients was your estimate on those different procedures, the effect of not having Medicare and Medicaid and JACHO [sic] and the operating room equipment. Do you have any estimate of the percentage of revenue that it -- that caused you, or the amount of revenue that that -- the lack of those services provided?

A: Yes, sir.

Q: What is that?

A: Well, from August -- or -- from July to February, I would estimate $832,000.00.

Hovorka also presented the following deposition excerpt:

Well, can you say with any degree of certainty that had you been provided with the operating room equipment, that it was JACHO [sic] -certified, and Medicare-approved, that you would have been earning $104,000.00 a month?

MR. HARRISON: He's already answered that.

A: I would say yes.

Hovorka did not present any other summary judgment evidence concerning his alleged damages due to the Hospital's lack of JCAHO accreditation or the lack of Medicare and Medicaid certification between October 1999 and February 2000.

A conclusory statement, even though made under oath, is not proper summary judgment evidence. *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.--Houston [1st Dist.] 1997, no writ).

12

A conclusory statement is one that does not provide the underlying facts to support the conclusion. *Id.* A conclusory statement is not sufficient to raise a fact issue. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). A witness's conclusory opinion testimony is not competent summary judgment evidence. *See El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366-67 (Tex. App.-- Dallas 2005, no pet.) (deposition testimony as to lost profits was not competent summary judgment evidence, because the deponent did not provide the basis for his calculations). Hovorka's summary judgment evidence as to the damages suffered because of the Hospital's alleged prior material breach is supported solely by conclusory statements.[5] Hovorka did not dispute that the Hospital paid him the amounts required by the Agreement. Instead, his summary judgment evidence was his own statement that he would have made an additional $832,000 in the approximate seven-month period that he performed under the Agreement, had the Hospital been JCAHO accredited and Medicare and Medicaid certified. Because Hovorka failed to present any testimony containing facts to support the assertion, the statement is conclusory and is not competent summary judgment evidence.

Hovorka's various responses therefore failed to present competent evidence establishing that the lack of JCAHO accreditation and/or Medicare and Medicaid certification actually damaged him in the short time that he performed under the Agreement or that the lack of accreditation and certification constituted material breaches of the Agreement, so that he was excused from performing under it.

Hovorka also argues that the Hospital committed a prior material breach of the Agreement

---

[5] Hovorka, for example, testified that "at least a dozen" of his neighbors did not come to the new facility because it was not Medicaid certified. He did not, however, testify whether any of these neighbors had need of a surgeon. Similarly, his claim that "60 percent of the service area" would not utilize the Hospital because of the lack of JCAHO accreditation is not supported by any survey evidence. There is, in fact, no evidence to support the dubious supposition that "60 percent of the service area" had ever even heard of the JCAHO.

by failing to provide locum tenens coverage for him while he was absent from Alpine for a one-week period, while taking American Board of Surgery examinations. Under the Agreement, the Hospital did promise to provide locum tenens coverage during Hovorka's absence in order to take the American Board of Surgery reviews and exams. As evidence of the Hospital's alleged breach, Hovorka stated in his affidavit that the Hospital promised it would provide locum tenens coverage while he was absent to take these reviews and exams. In addition, Hovorka presented an excerpt from his deposition concerning his request for locum tenens coverage, in which he testified:

Q: Was there -- were there patients of yours that weren't seen during that -- that week period?

A: Well, I was not there. I -- I don't -- I don't know.

Q: Well, how do --

A: I --

Q: -- you know that coverage was not provided for you?

A: There -- there -- there was no coverage. That's what I was told at the time I returned.

As Hovorka's own summary judgment evidence shows, he was not aware whether any of his patients was not seen during his absence. Hovorka therefore failed to present any evidence that the Hospital breached the locum tenens provision of the Agreement.

As for the alleged promise of an office, Hovorka presented an excerpt of his deposition in which he testified that he was promised in March and thereafter that he would have an office building ready for him to move into when arrived in Alpine. The Agreement contains no such obligation. In his brief, Hovorka argues that Conejo admitted in his deposition "that the promises made to Dr. Hovorka about his office building were not fulfilled." However, Conejo's testimony,

14

which Hovorka presented in his summary judgment response, was that Hovorka resigned before the plans for his new office were completed. Hovorka failed to raise an issue of genuine material fact with regard to the alleged promise of a new office.

Hovorka's first issue is overruled.

## B. Issue Two

In his second issue, Hovorka argues that the trial court committed reversible error by submitting an improper definition of ratification of fraud. We review a trial court's refusal to submit requested jury instructions under an abuse of discretion standard. *Housing Auth. of City of El Paso v. Guerra*, 963 S.W.2d 946, 952 (Tex. App.--El Paso 1998, pet. denied). A trial court abuses its discretion when its action is arbitrary or unreasonable or without any reference to any guiding rules or principles. *Id.* at 952-53.

As a portion of the prelude to asking the jury whether CHS and/or the Hospital committed fraud against Hovorka, the court included a paragraph which read: "If a person is induced by fraud to enter into a contract, but continues to accept benefits under the contract after becoming aware of the fraud he affirms and is bound by the terms of the contract." Hovorka objected to the foregoing instruction on the basis that it did not contain the following additional wording: "[H]owever if that same person attempts to stop the fraud then that K [contract] is not affirmed." The trial court refused to add the requested language.

On appeal, Hovorka argues that the definition submitted was improper, because the court did not amend its definition to include his proposed additional language. Hovorka relies on *Fortune*

15

*Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000).[6] In *Fortune Production*, four natural gas producers brought suit against Conoco, alleging that Conoco made factual misrepresentations during contract negotiations to induce them to accept lower prices for their gas than they otherwise would have accepted. *Id.* at 674. Some of the agreements at issue involved written contracts for a stated term, but two did not. The jury found that all of the plaintiffs had ratified the fraud after they became aware of it, with the intent to ratify the contracts in spite of the fraud. *Id.* at 675.

On appeal, the Texas Supreme Court affirmed as to those plaintiffs who had no written contract for a specific them. However, it held that those plaintiffs who did have such written contracts for a stated term were not foreclosed from recovering fraud damages, because they had continued to perform their obligations under the contracts, after they learned of the fraud that induced them to enter them. *Id.* at 680.

"An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); TEX. R. CIV. P. 278. *Fortune Production* does not address Hovorka's proposed definition, because the definition finds no support in the evidence. Unlike the successful plaintiffs in that case, Hovorka did not continue to perform his obligations for the term of his agreement.

In *Fortune Production*, the Supreme Court analogized the unsuccessful plaintiffs, who continued to supply gas to Conoco after the expiration of their written agreements and after they learned of Conoco's fraud, to "someone who decides to perform wholly executory contracts after

---

[6] Hovorka timely submitted the requested language to the trial court. *See* TEX. R. CIV. P. 273. However, the record does not contain any explanation as to why the requested language was an appropriate, let alone obligatory, addition to the court's proposal; Hovorka specifically did not call the court's attention to the *Fortune Production* case. *Cf.* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly . . . the grounds of the objection.").

learning of fraud. The fraud no longer induced their performance." 52 S.W.3d at 680. Similarly, Hovorka admits that he learned of the purported fraud[7] in May 1999, before he was scheduled to commence his performance on August 1. The Supreme Court addressed Hovorka's situation as follows:

> The Restatement (Second) of Torts takes the position that if a party who knows of the fraud makes a promise to perform all or part of the agreement after learning of the fraud, that promise is binding. *See* RESTATEMENT (SECOND) OF TORTS § 85. An illustration given in the Restatement is: "A is induced by B's fraud to promise $100 in return for a worthless chattel. After discovering the fraud A promises B to pay as agreed. The promise is binding." *Id.* cmt. b, illus. 1.

*Id.* at 679.

Hovorka has not cited any other authority, either at trial or on appeal, to support his proposed language. We overrule Hovorka's second issue.

### III. CONCLUSION

We affirm the judgment of the trial court.


KENNETH R. CARR, Justice

August 21, 2008

Before Chew, C.J., McClure, and Carr, JJ.

---

[7] In light of our disposition, in Part II. A., of Hovorka's claims regarding operating room equipment, office space, and locum tenens coverage, the only claims which could arguably survive the partial summary judgment and the jury's verdict are the JCAHO and Medicare/Medicaid issues.

17