Willard **RAGLAND**, Jr., Appellant,

v.

**BNSF RAILWAY COMPANY,**
Appellee.

No. 08-14-00094-CV

Court of Appeals of Texas,
El Paso.

September 14, 2016

---

Michael J. Craddock, Craddock, Reneker & Davis, LLP, Dallas, TX, for Appellee.

Kenneth Fenelon, Houston, TX, for Appellant.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

STEVEN L. HUGHES, Justice

Willard Ragland, Jr. sued his employer, BNSF Railway Company, under the Federal Employers Liability Act. Ragland claimed he suffered a work-related cumulative trauma injury to both knees that manifested in early 2010. He also claimed BNSF made a negligent work assignment to him on August 2, 2010, knowing that he was having issues with his knees that day. BNSF moved for summary judgment asserting that Ragland's cumulative trauma claims were related to an injury Ragland had suffered to his left knee in 2008 and were barred by the three-year FELA statute of limitations. BNSF also asserted Ragland had no evidence to support his negligent work assignment claim. We conclude the trial court properly granted summary judgment on Ragland's negligent work assignment claim, but erred in granting summary judgment on Ragland's cumulative trauma claims.[1]

## BACKGROUND

### Ragland's Claims

Ragland filed suit against BNSF on November 5, 2012. In his second amended petition, Ragland sought damages in excess of $4 million. Although his petition was not a model of clarity, the parties appear to agree the petition raised two separate causes of action under the FELA: (1) a claim for work-related cumulative trauma injuries to both knees that culminated in the two meniscus repair surgeries in August 2010; and (2) a claim for negli-

1. This appeal was transferred from the Fort Worth Court of Appeals, and we apply the precedent of that Court to the extent required by Tex. R. App. P. 41.3.

gent work assignment based on BNSF's assignment of Ragland to work on a pre-gauger machine on August 2, 2010.

## BNSF's Motion for Summary Judgment

BNSF raised two separate grounds for summary judgment. First, BNSF sought traditional summary judgment on the ground Ragland's "cumulative trauma" knee-injury claims were barred by the FELA three-year statute of limitation because those claims accrued in June 2008 when Ragland was first diagnosed with a meniscus tear in his left knee. According to BNSF, this put Ragland on notice he was suffering the effects of cumulative trauma in both knees. Second, BNSF sought both traditional and no-evidence summary judgment on Ragland's negligent work assignment claim because Ragland had failed to inform BNSF that he was suffering from any knee problems before his work assignment on August 2, 2010, and because Ragland waited until late that afternoon to disclose his knee pain after it was too late to alter the outcome.

## Ragland's Response

As to his cumulative trauma claims, Ragland responded that he suffered two separate knee injuries while working for BNSF. The first involved a June 2008 acute injury to his left knee, which occurred while he was working as a truck driver for BNSF. The second—the subject of this lawsuit—involved an injury to both knees that resulted from cumulative trauma that first manifested itself in early 2010

while he was working in BNSF's "maintenance of way" division. As to his negligent work assignment claim, Ragland contended the summary judgment evidence raised a fact issue that BNSF's supervisors continued his injurious assignment on August 2, 2010, even after learning the assignment was causing Ragland severe knee pain.

## The Summary Judgment Evidence

### The 2008 Left Knee Injury

On June 26, 2008, Ragland stepped out of a BNSF truck he had been driving, heard a "pop," and felt a pain in his left knee. Ragland was seen that same day by a doctor, who initially diagnosed Ragland with an "[i]nternal derangement of left knee." When Ragland's symptoms did not improve, the doctor ordered an MRI, which indicated Ragland had a tear in the medial meniscus of his left knee.[2] Ragland underwent arthroscopic surgery to repair the meniscus tear in July 2008, followed by several weeks of rehabilitation and physical therapy. The operative report indicates the 2008 surgery was successful, and after completing all required treatment, Ragland's doctor released him to work "full duty," without restrictions in September 2008.

Ragland worked directly with BNSF to settle his claim for the 2008 injury, and signed a release waiving any additional claims arising out of the "accident of June 26th, 2008[.]" During his recorded interview with a BNSF Claims Representative on October 1, 2008, in which the release was discussed, Ragland stated that he had

---

**2.** The meniscus is a "C-shaped piece of tough, rubbery cartilage that acts as a shock absorber between the shinbone and thighbone." *See* MayoClinic.org http://www.mayoclinic.org/diseases–conditions/torn–meniscus/multimedia/torn–meniscus/img–20007984 (last visited Sept. 13, 2016). When a meniscus tears, the patient may experience a "popping sensation." *Id.* A torn meniscus may result from various activities, including "pivoting or sudden stops and turns," or "[e]ven kneeling, deep squatting or lifting something heavy[.]" Alternatively, in older adults "degenerative changes of the knee may contribute to a torn meniscus." *Id.*

no complications from the 2008 surgery and had "[n]o pain at all" in his knee. He informed the representative, however, that he experienced a "little soreness every once in a while," which he believed was normal post-surgical pain. Ragland also informed the Claims Representative that he had been back at work for three weeks at the time of the interview, and that he believed he would have no issues being able to perform his job satisfactorily.[3]

### *Events Leading Up to August 2, 2010*

After the October 2008 interview, Ragland did not complain to any medical professionals that he was suffering from pain in either of his knees until February 26, 2010, when he first presented at the Electra Medical Clinic, complaining of pain in his right knee only. The doctor's notes indicated that Ragland reported his right knee the pain was "chronic" and that it had "recently worsened" and felt as if it was "going to buckle." A subsequent MRI of Ragland's right knee, performed on March 11, 2010, revealed a tear in the medial meniscus in the right knee.

Ragland returned to the same clinic on July 26, 2010, complaining of "bilateral knee pain." During that visit, Ragland reported for the first time that he had pain in his left knee, informing the doctor that he had "re-injured" that knee while "squatting" on an unspecified date. Ragland further complained that his right knee was "gradually getting worse." The doctor's notes from that visit reflected that, although Ragland's March MRI report indicated that surgery was necessary to repair the meniscus tear in his right knee, Ragland was unable to "take off"

from work until November, at which time he intended to schedule the surgery.

Ragland acknowledges that he intentionally delayed having the surgery because his "plan was to just get through to layoff season" before scheduling the surgery, and to then "[t]ake the lay off" and not bid on any other jobs until after he healed from the surgery. In the meantime, Ragland intended to bid only on jobs he believed would not cause further pain or damage to his knees. In particular, he intended to target jobs in which he could operate machinery from a seated position so that he could be off his knees.

### *The August 2, 2010 Job Assignment*

In July 2010, Ragland bid for and received a two-week temporary assignment on a rail gang to perform maintenance along the tracks near Sherman, Texas beginning August 2, 2010. Ragland believed he had been assigned to a seated machine that would not cause further strain to his knees. When he arrived at the job site that morning, however, the foreman, who had never met Ragland before and did not know his medical history, assigned him to operate a "pregauger" machine that required Ragland to walk alongside the machine on the ballast or ties of the railroad tracks. Ragland does not dispute that the foreman had the right to assign him to a different machine that morning. He further acknowledges that he could have objected to the assignment to either the foreman or the other supervisor at the job site, Assistant Roadmaster Adam Bankston, but that he chose not to do so because he was concerned that if he did object, he might be sent home without pay.[4] When

---

**3.** BNSF did not contend that the release barred Ragland's current claims.

**4.** Although a BNSF employee may bid on a particular job or machine, pursuant to the railroad's collective bargaining agreement,

BNSF can reassign the employee based on its needs on any given day. There were four different machines in the "group" of machines that Ragland bid on, two of which were seated and two of which required the

first assigned to the pregauger machine, Ragland did not tell either the foreman or Bankston that he had been experiencing any problems with his knees or that he had any other physical limitations that would cause him difficulties in operating the machine.[5] Further, the record reflects that neither the foreman nor Bankston had any record of Ragland's medical history at the job site, and had no way of knowing about his prior knee surgery because Ragland had no active work restrictions in his file at that time.

Ragland admits that he operated the pregauger machine, without complaint or objection, from approximately 4 a.m. until at least 10 a.m., when the crew took their lunch break. Ragland claims that either shortly before or during the lunch break, he told Bankston, and another supervisory employee, Assistant Director of Management Production (ADMP) Matthew Keller, that he was having "severe pain" in his knees from operating the pregauger machine, and that the machine was causing his knees to "kill" him. Ragland further contends that he informed Keller that he had been recently diagnosed with a torn meniscus in his right knee and that he was awaiting surgery to repair the tear. Ragland asserts that the two supervisors nev-

ertheless advised him to continue working, which he did until approximately 12:30 p.m., when he claims he stepped in a hole that had been dug out by a piece of railroad equipment along the gang line. Ragland contends this caused him to have such severe pain that he was unable to continue working, and he thereafter informed Bankston that he was in need of medical attention.

In his deposition testimony, Keller acknowledged he had a conversation with Ragland at approximately 10 a.m., shortly after he arrived at the worksite, when he stopped to introduce himself to Ragland. Apparently prompted by the fact that Keller was wearing a knee brace that day as the result of his own recent knee surgery, the two men discussed Keller's surgery as well as Ragland's prior surgery on his left knee, the meniscus tear in Ragland's right knee, and Ragland's upcoming surgery. However, Keller denied that Ragland informed him that he was in any pain or that Ragland had asked to be taken off the pregauger machine. Keller recalled only that he advised Ragland "to take it easy and to get off his feet whenever he needed to."[6]

In his deposition, Bankston testified that Ragland did not report having any issues

operator to stand. As permitted by the collective bargaining agreement, when an employee has bid on a particular machine group appears at a job site, the foreman will assign the employee to a machine within that group based on the railroad's needs and production considerations that day. If an employee complains about a physical limitation or about being fatigued, the foreman will attempt to accommodate the employee, if possible, by reassigning him to another machine.

5. Ragland contends the foreman failed to ask him if he was "physically capable of operating the machine" when he assigned him to operate the pregauger. BNSF, however, had no duty to ascertain Ragland's fitness for that particular job. When an employee bids on a

particular job, BNSF assumes that the employee is capable of performing that job, absent any indication in the employee's file of a medical restriction that would alert them to a problem. Further, as BNSF points out, a railroad generally has no duty to ascertain whether an employee is physically fit for his job. As discussed in more detail below, the duty to avoid making a negligent work assignment arises only if the railroad is placed on notice that the employee is suffering from a physical limitation. *Fletcher v. Union Pac. R. Co.*, 621 F.2d 902, 909 (8th Cir.1980).

6. Keller also summarized his version of what occurred that day in an e-mail to his supervisor dated August 3, 2010, which was consistent with his deposition testimony.

with his knees or the operation of the pregauger machine until approximately 12:15 p.m., when Bankston noticed that Ragland appeared to be fatigued. Bankston recalled that after Ragland admitted he was fatigued, he personally took over the operation of Ragland's machine, and while Ragland walked alongside him, Ragland told him for the first time that he was having some "issues with his knees, and that his knee was bothering him." Bankston did not require Ragland to continue working, and instead, at Ragland's request, he allowed Ragland to walk to his car to retrieve his medication. Bankston later received a call informing him that Ragland was at the Sherman depot, and that he was in need of medical attention for his knees.[7]

Both Bankston and Keller met Ragland at the depot, and Bankston agreed to take Ragland to a nearby medical clinic. Before being transported to the clinic, Ragland provided a handwritten statement describing his injury. In his handwritten statement, Ragland indicated that he had a pre-existing meniscus tear, and that when his knees started hurting him, he requested and received permission from Bankston to seek medical attention at approximately 12:30 p.m. There is no mention in the statement that Ragland had any earlier conversations with Bankston or Keller that day. Ragland also filled out an injury report form that same day, in which he indicated he had been suffering from an "accumulative" injury for approximately eight months, and that he had been previously diagnosed with a "torn inner meniscus."

Ragland subsequently had an MRI performed on his left knee, which revealed a tear to the medial meniscus in the left knee, in addition to the previously-diag-

nosed meniscus tear in his right knee. After having surgery to repair the tears in both of his knees in August 2010, and after completing rehabilitation, Ragland returned to work in January 2011. Ragland was subsequently diagnosed in January 2013 with osteoarthritis, and following x-rays on both of his knees in April 2013, was further diagnosed with degenerative joint disease.

### The Trial Court's Ruling

Following a hearing on BNSF's motion for summary judgment, the trial court issued a written order sustaining objections BNSF had made to Ragland's summary judgment affidavit and granting BNSF's summary judgment motion as to Ragland's "claims for negligent assignment and cumulative trauma." Shortly thereafter, Ragland filed a "Stipulation of Abandonment Pursuant to TRCP Rule 165," stating that he was abandoning his remaining claim against BNSF for allegedly failing to provide him with a "safe place to work on August 2, 2010 when he stepped in a hole while working." Based on Ragland's abandonment of his remaining claim, the trial court entered a final judgment, noting that its earlier order disposed of all of the live claims in Ragland's lawsuit.

### DISCUSSION

#### Ragland's "Sham" Affidavit

Ragland first contends that the trial court abused its discretion in sustaining BNSF's objections to his summary judgment affidavit. While we conclude the trial court abused its discretion, we also conclude any error was harmless.

---

7. Bankston also provided a written statement dated that same day, describing the incident, which was consistent with his deposition testimony.

### Standard of Review

■ We review a trial court's ruling concerning the admission or exclusion of summary judgment evidence for an abuse of discretion. *Ordonez v. Solorio*, 480 S.W.3d 56, 67–68 (Tex.App.–El Paso 2015, no pet.); *see also Sauls v. Munir Bata, LLC*, No. 02–14–00208–CV, 2015 WL 3905671, at *5 (Tex.App.–Fort Worth June 11, 2015, no pet.) (mem. op.) (trial court's ruling sustaining objection to summary judgment evidence is reviewed for abuse of discretion).

### Background

In addition to attaching his own medical records to his response to BNSF's motion for summary judgment, Ragland provided a summary judgment affidavit, in which he chronicled the history of his various knee problems, and provided his version of what occurred on August 2, 2010. In particular, Ragland stated in his affidavit that he had informed Bankston and Keller at 10 a.m. that operating the pregauger was causing him "severe pain" and that it was causing his knees to "kill" him, but they failed or refused to take him off the machine until two and a half hours later when he stepped in the hole rendering him unable to continue working.

BNSF objected to the statement in Ragland's affidavit in which he indicated that he had reported his knee pain to Keller at 10 a.m. on August 2. BNSF claimed this statement contradicted Ragland's prior deposition testimony in which he only described one conversation that he had with his supervisors that day—his 12:30 p.m. conversation with Bankston during which Ragland reported his knee pain and received permission to take a break and to ultimately seek medical treatment. In light of this alleged contradiction, BNSF labeled Ragland's summary judgment affidavit as a "sham affidavit," and asked the trial court to strike the allegedly contradictory statement in the affidavit under the sham affidavit rule.

### Analysis

■ As a preliminary matter, we note that contrary to Ragland's apparent belief, the trial court did not strike his entire summary judgment affidavit when it granted BNSF objections. As BNSF points out, BNSF's objections went only to the single statement in the affidavit concerning when he reported his injury to his supervisors on August 2, 2010, and the trial court indicated that it was sustaining only that objection. This statement relates solely to Ragland's negligent work assignment claim.

As to that statement, however, there does not appear to be a direct contradiction between Ragland's deposition testimony and his summary judgment affidavit. Ragland never stated in his deposition that his handwritten statement provided a complete description of the events that day, and there is nothing in Ragland's handwritten statement indicating that he only had one conversation with his supervisors that day. Further, although his timeline is not entirely clear, Ragland testified at his deposition that he actually had two conversations with Bankston on August 2, the first occurring during the lunch break at 10 a.m., when he allegedly told Bankston that his knees were "killing" him, and the second occurring after Ragland allegedly stepped in the hole later that afternoon, in which Ragland advised Bankston that he required medical attention. As such, it is possible to reconcile Ragland's deposition testimony with his affidavit.

Further, the Fort Worth Court of Appeals, whose precedent we must follow when it conflicts with our own, does not follow the sham affidavit rule. *See* Tex. R. App. P. 41.3. Many courts in Texas includ-

ing this Court follow the sham affidavit rule and will strike a party's summary judgment affidavit when it directly conflicts with the party's prior sworn testimony. *See, e.g., Rivas v. Sw. Key Programs, Inc.,* —— S.W.3d ——, ——, 2015 WL 6699532, at *4 n. 2 (Tex.App.–El Paso Nov. 3, 2015, no pet.). However, as Ragland points out and BNSF acknowledges, the Fort Worth Court of Appeals has expressly rejected the sham affidavit rule, and has instead held that even "when conflicting inferences may be drawn between a party's summary judgment affidavit and his deposition on matters of material fact, a fact issue is presented." *See, e.g., Davis v. City of Grapevine,* 188 S.W.3d 748, 756 (Tex.App.–Fort Worth 2006, pet. denied). Although BNSF argues that the Fort Worth Court of Appeals appears to be on the verge of overturning its decision in *Davis,* as recently as June 2015, the Court reaffirmed its rejection of the sham affidavit rule. *See Sauls,* 2015 WL 3905671, at *7 ("this court does not apply the sham-affidavit doctrine and continues to adhere to the principle that 'when conflicting inferences may be drawn between a party's summary judgment affidavit and his deposition on matters of material fact, a fact issue is presented' ") (quoting *Davis,* 188 S.W.3d at 756).

■ However, as we discuss below, this error had no impact on the trial court's decision to grant summary judgment on Ragland's negligent work assignment claim, because even if Ragland had informed his supervisors at 10 a.m. that working on the pregauger machine was hurting his knees, there is no evidence that BNSF's alleged negligence in failing to take Ragland off the machine at that time was the cause of any additional injury to Ragland. Accordingly, we conclude that while the trial court abused its discretion when it sustained BNSF's objection to

Ragland's affidavit, the trial court's error was harmless. *See* Tex. R. App. P. 44.1(a)(1) (no judgment may be reversed unless the error complained of probably caused the rendition of an improper judgment).

### Statute of Limitations and the Cumulative Trauma Claims

Ragland next contends the trial court erred when it granted traditional summary judgment on his claims for his cumulative trauma knee injuries, contending a genuine issue of material fact exists concerning when those injuries accrued and whether the statute of limitations had run on those claims before he filed his lawsuit on November 5, 2012. We agree.

### *Standard of Review and Applicable Law*

■ We apply federal substantive law and Texas procedural law to an FELA dispute. *BNSF Ry. Co. v. Phillips,* 485 S.W.3d 908, 910 (Tex.2015). The statute of limitations for an FELA claim is three years from the date the plaintiff's "cause of action accrued." *Id.;* 45 U.S.C. § 56. Unlike most statutes of limitations, which generally operate as an affirmative defense, an FELA plaintiff bears the burden of proving that the lawsuit was timely filed. *Phillips,* 485 S.W.3d at 910 (citing *Bealer v. Mo. Pac. R.R. Co.,* 951 F.2d 38, 39 (5th Cir.1991) (per curiam)). Federal courts apply the discovery rule when the plaintiff has suffered a purely latent injury. *Id.* (citing *Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223, 229 (5th Cir.1984)). An FELA claim accrues under the discovery rule "when the accumulated effects of the deleterious [working conditions] manifest themselves." *Id.* (quoting *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)). The United States Court of Appeals for the Fifth Cir-

cuit has further refined the rule by stating that "a claim accrues when a plaintiff knows or should know that his injury is work related, that is, when a plaintiff is aware of the critical facts concerning his injury and its causation." *Id.* (quoting *Bealer*, 951 F.2d at 39). The ultimate determination of when a plaintiff's cause of action accrues is generally one of fact; however, "the question becomes one of law when an overwhelming array of evidence indicates that the case is time barred." *Id.* (citing *Crisman v. Odeco, Inc.*, 932 F.2d 413, 417 n. 4 (5th Cir.1991)).

Because Ragland had the burden of proof on limitations, BNSF could have moved for no-evidence summary judgment and thereby placed the initial burden on Ragland to raise a fact issue concerning when his FELA claim for cumulative trauma accrued. BNSF, however, moved for traditional summary judgment on limitations. Accordingly, BNSF assumed the initial burden under Texas summary judgment procedure to establish, as a matter of law, that Ragland's cumulative trauma claims accrued more than three years before he filed suit, *i.e.*, that Ragland knew or should have known the critical facts concerning his injury and its causation more than three years before filing suit. *See id.* ("[W]e apply ... our own procedural law to [an FELA] dispute."); *see also Billman v. Missouri Pac. R. Co.*, 825 S.W.2d 525, 526 (Tex.App.–Fort Worth 1992, writ denied) (where, in reviewing a summary judgment on statute of limitations in a FELA case, the court concluded that "[a]lthough this case is one of federal substantive law, we must apply the Texas standard of review for summary judgments").

Thus, as the moving party, BNSF carried the burden to show there was no genuine issue of material fact on an essential element of limitations and that it was entitled to judgment as a matter of law. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex.2005); *Rivas*, —— S.W.3d at ——, 2015 WL 6699532, at *2. In reviewing the adequacy of the summary judgment evidence, we apply the well-established standards of review for traditional summary judgments. We review the trial court's grant of summary judgment de novo. *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex.2015); *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex.2013); *Ordonez*, 480 S.W.3d at 64. The evidence is viewed in the light most favorable to the nonmovant. *Shell Oil Co.*, 464 S.W.3d at 654; *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005). In reviewing the record, we indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in favor of the nonmovant. *Shell Oil Co.*, 464 S.W.3d at 654; *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex.2012).

### Analysis

Ragland filed his lawsuit on November 5, 2012. Therefore, the key question in determining whether Ragland timely filed his lawsuit within the three-year statute of limitations is whether Ragland knew or should have known of the injury and its cause prior to November 5, 2009. BNSF contends that Ragland knew or should have known that he was suffering from a work-related cumulative trauma injury to *both* of his knees in June 2008 when Ragland was first diagnosed with a torn medial meniscus in his left knee. BNSF's argument centers on its belief that Ragland's 2008 left knee injury was caused by cumulative trauma, and that his subsequent knee injuries in 2010 were also caused by this same cumulative trauma. In effect, BNSF asserts that the 2010 injuries were simply a continuation of that same trauma that manifested itself in 2008, when Rag-

land first sought treatment for his left knee pain and was diagnosed with a meniscus tear. BNSF contends that this diagnosis, at the very least, imposed a duty on Ragland to investigate the cause of his 2008 injury, and that if he had done so, he would have discovered that he was suffering from cumulative trauma at that time. *See Billman,* 825 S.W.2d at 527 (an awareness of critical facts of an injury imposes a duty upon a claimant to investigate and confirm whether he is suffering from a cognizable injury).

Ragland, on the other hand, argues that the 2008 meniscus tear in his left knee was the result of a distinct and "acute" accident, which occurred when he stepped out of the truck and heard his knee "pop." He further contends that, in contrast, the two knee injuries that culminated in his 2010 surgeries stemmed from a separate and unrelated cause, *i.e.*, from cumulative trauma. Ragland also asserts that there is nothing in the record to reflect that he began having any symptoms that would have alerted him that he was suffering from cumulative trauma in either of his knees until early 2010 when he first sought medical treatment for his newly-developed knee pain.

Because different factors must be considered in determining when Ragland's claims accrued for his two knee injuries, we analyze each claim separately.[8]

### The Right Knee

Regardless whether Ragland's left knee in 2008 stemmed from an acute event or from cumulative trauma, we do not believe the diagnosis of a meniscus tear in his left knee, standing alone, would have put Ragland on notice that his right knee might also be suffering from this same fate, or that it would have triggered any duty on Ragland to seek a diagnosis on his right knee, which was asymptomatic at the time. BNSF cites no authority, and we are aware of none, that would support BNSF's apparent argument that an employee who has suffered a cumulative trauma to one body part is somehow automatically put on notice that he might also be suffering from an injury to another body part, absent symptoms alerting him to the possibility of any such injury.

A federal district court rejected a similar argument in *McCain v. CSX Transp., Inc.,* 708 F.Supp.2d 494 (E.D.Pa.2010), an FELA case in which a railroad employee claimed injuries to both his left and right knees. The plaintiff's medical records, as well as the plaintiff's own testimony, revealed that he began experiencing pain in his left knee in 2001 and sought medical treatment. Despite being aware that his work was the likely cause of his left knee pain, the plaintiff did nothing further to determine the source of his injury until two years later when he visited an orthopedic specialist in January 2003, who diagnosed him with degenerative joint disease. The court concluded that under those circumstances, the plaintiff knew or should have known that his left knee pain was work-related as early as 2001 when he first sought medical treatment, but because the plaintiff did not file his lawsuit until five years later, his claim with regard to his left knee was barred by the three-year statute of limitations. *Id.* at 500.

---

8. We disagree with BNSF's assertion that Ragland inadequately briefed, and therefore waived, whether the statute of limitations ran with regard to his left knee. Ragland clearly briefed the issue of limitations with regard to both knees. BNSF's confusion apparently stems from Ragland's mistaken reference to his right knee in one of his sub-issue headings, when he intended to refer to his left knee, as indicated by the express discussion of his left knee in the body of that sub-issue.

The court noted, however, that the plaintiff's right knee pain was an entirely separate issue. The plaintiff testified that he did not begin experiencing pain in his right knee until after he had knee replacement surgery on his left knee in 2004. The railroad failed to point to any evidence suggesting otherwise, and in particular, produced no medical records indicating that the plaintiff complained of or sought medical treatment for his right knee before that time. Therefore, the court concluded that a fact issue existed whether the plaintiff knew or should have known that he had an injury to his right knee outside the three-year limitations period. Accordingly, it denied the railroad's motion for summary judgment as to the plaintiff's right knee injury. *Id.* at 500–01.

We believe the general principle set forth in *McCain* is a sound one. Merely because a plaintiff suffers a cumulative trauma injury affecting one body part, does not mean the plaintiff is automatically put on notice that he also might be suffering the same condition in another body part. BNSF attempts to factually distinguish *McCain*, arguing that, unlike in *McCain*, there was "strong summary judgment evidence" in the present case to establish that Ragland's right knee injury manifested itself outside the three-year statute of limitations period. We conclude, however, that the evidence was conflicting at best and did not conclusively establish when Ragland's right knee injury first manifested itself.

BNSF first argues that Ragland's medical records indicate that his right knee symptoms began much earlier than January or February 2010, as claimed by Ragland in his summary judgment affidavit. In particular, BNSF points to the office notes from Ragland's February 26, 2010 visit to the Electra Medical Clinic, when Ragland first reported that he was suffering from right knee pain, which indicate that Ragland described his pain as being "chronic," and informed the doctor that his pain had been worsening recently. BNSF argues these records indicate that Ragland's "chronic" pain was ongoing and therefore must have necessarily manifested itself sometime before the February 2010 office visit. While we agree this office note suggests Ragland began experiencing pain sometime before his first office visit in February 2010, the note provides no indication of what Ragland meant when he stated that the pain was "chronic," and provides no information when the pain actually began, or how serious the pain was prior to that office visit. This record alone, therefore, does not conclusively establish that Ragland's symptoms manifested themselves before November 5, 2009 or were serious enough to put a reasonable person on notice. *See Phillips,* 485 S.W.3d at 912 (the discovery test is not centered on when a plaintiff first subjectively believes that his injuries are work-related, but is instead centered on when a reasonable person would have known of that fact).

Similarly, BNSF points to Ragland's March 2010 MRI report indicating that Ragland had "degenerative changes" in his right knee. The MRI report, however, suffers from the same shortcomings as the office notes because it provides no timeline for when the degenerative changes began or how significant the changes were. More importantly, it does not suggest when Ragland necessarily would have begun experiencing symptoms from the degenerative changes, and therefore does not conclusively establish that the symptoms started before November 5, 2009.

Finally, BNSF points to a statement Ragland made during his recorded interview with the claims representative in August 2010, in which he stated that it

"wasn't long after" his July 31, 2008 left knee surgery that he began having right knee pain. We note, however, that Ragland did not provide any indication of what he meant by the term it "wasn't long after" his surgery. It is therefore unclear whether Ragland meant the pain started days, weeks, or even months after the surgery. Further, Ragland later clarified that his pain was not significant enough for him to seek medical attention until March 2010.

Moreover, even if we were to assume that Ragland did have *some* pain in his right knee outside the limitations period, the record is barren of any indication of how significant the pain was, or whether the pain would have put a reasonable person on notice that it was symptomatic of a cognizable work-related injury. In a similar situation, a railroad employee admittedly felt "certain pains" in his knees more than three years before he filed his lawsuit, which had "steadily worsen[ed] over the years[.]" *Sandoval v. Union Pac. R.R. Co.,* 396 F.Supp.2d 1269, 1271 (D.N.M. 2005). Although the plaintiff's first medical visit for his pain was within the limitations period, he reported to doctors that he had been experiencing knee pain for years prior to his first visit, which would have placed the onset of pain outside the limitations period. *Id.* at 1271. However, the court in *Sandoval* concluded the record did

not clearly establish that the plaintiff's pain was severe enough to put him on notice that he was suffering from a cognizable work-related injury, particularly because he did not seek treatment for the pain until much later. *Id.* at 1272. Instead, the court found that the plaintiff could have reasonably believed that the pain he was experiencing was consistent with the "aging process and/or commonplace muscle soreness due to physical exertion." *Id.* at 1274. Accordingly, the court held that "the key question of when Plaintiff's injury 'manifested itself' as the actual cause of his pain is a disputed issue of material fact," and therefore denied the railroad's motion for summary judgment. *Id.*[9]

Similarly, in the present case, while the evidence suggests that Ragland *may* have had some pre-existing pain in his right knee that began outside the three-year statute of limitations period, it does not conclusively show Ragland knew or that a reasonable person should have known that he was suffering from a cognizable work-related injury at that time. We also find it significant that all of the remaining evidence, beginning with Ragland's August 2, 2010 handwritten statement and the injury form that he filled out that same day, reflect that Ragland consistently told his supervisors that his right knee pain began in early 2010.[10] We also find it significant

9. *See also Green v. CSX Transp., Inc.,* 414 F.3d 758, 763–64 (7th Cir.2005) (fact issue existed regarding when the plaintiff's FELA cause of action for a shoulder injury accrued where the plaintiff's medical records indicated that the plaintiff sought treatment on only one occasion outside the limitation period and where there was no evidence that the pain was serious enough before the limitation period to put plaintiff on notice that she had a cognizable work-related injury); *St. George v. BNSF Ry. Co.,* 60 F.Supp.3d 1016, 1026–27 (D.Minn.2014) (fact issue remained regarding whether FELA plaintiff should have been aware before 2009 that the pain he experienced in his shoulder was the result of a

work-related injury, where his pain did not become severe until 2009, at which time he received a diagnosis that he had a rotator cuff impingement); *Brenner v. Consol. Rail Corp.,* 806 F.Supp.2d 786, 792–93 (E.D.Pa.2011) (fact issue existed whether FELA plaintiff knew or should have known that he was suffering from a cognizable knee injury before 2006 even though the plaintiff had made isolated complaints of knee pain to his doctors in 1990 and 2001).

10. In Keller's e-mail that he sent to his supervisor on August 3, 2010, Keller related that Ragland had advised him on August 2, that

that Ragland testified consistently at his deposition and in his summary judgment affidavit that his right knee pain started sometime in January or February 2010.

The conflicting nature of the evidence distinguishes it from the Supreme Court's decision in *Phillips*. The BNSF employee in *Phillips* claimed that during his thirty-one year tenure with BNSF, he frequently worked on rough riding locomotives with poorly maintained seats, which caused cumulative damage to his spine. 485 S.W.3d at 911. The Texas Supreme Court reversed a jury verdict in the employee's favor and rendered a take-nothing judgment, in part, because the employee sought medical treatment for his spine pain and received a definitive diagnosis of the cause of his pain more than three years before he filed suit. *Id.* at 913 (the "evidence in this case, which includes a concrete diagnosis of Phillips's back injuries, is not only sufficient to establish accrual, but is also conclusive").

Unlike *Phillips*, in the present case, Ragland's medical records established that he did *not* seek medical treatment for his right knee pain or receive a definitive diagnosis of the cause of his pain before November 5, 2009. We recognize that a definitive or "concrete diagnosis" is not always required to put a plaintiff on notice that he is suffering from a work-related injury. *See Emmons v. S. Pac. Transp. Co.*, 701 F.2d 1112, 1122 (5th Cir.1983) (a plaintiff need not have received a formal diagnoses from a physician for the statute of limitations to commence if the plaintiff otherwise knew or should have known that he was suffering from an injury that was work related); *see also BNSF Ry. Co. v. Acosta*, 449 S.W.3d 885, 893 (Tex.App.–El Paso 2014, no pet.) (although the plaintiff did not receive a definitive diagnosis until 2010, the trial court erred in not granting railroad's summary judgment, where the his right knee pain had started only eight

plaintiff acknowledged that his back injuries stemmed from a work-related accident that occurred in 2005 for which he sought medical attention). In absence of a definitive diagnosis, however, there must be some other conclusive evidence to establish that the plaintiff otherwise knew or should have known that he was suffering from a work-related injury outside the limitations period before summary judgment will be granted.

There is simply no conclusive evidence that would cause us to conclude that, as a matter of law, Ragland knew or a reasonable person should have known that he was suffering from a cognizable, work-related injury to his right knee outside the limitations period. We therefore conclude a fact issue exists concerning when Ragland's cumulative trauma cause of action for his right knee injury accrued, and that the trial court erred in granting summary judgment on that cause of action.

### *The Left Knee*

Exactly when Ragland's claim for his left knee injury began to accrue necessitates a different analysis, which centers primarily on whether the evidence conclusively established that Ragland's 2008 left knee injury resulted from the same cumulative trauma that subsequently caused his 2010 left knee injury, or whether it was caused by an unrelated traumatic event in June 2008 when Ragland stepped out of his truck and heard his knee "pop." If the evidence conclusively establishes that Ragland was diagnosed with a cumulative trauma injury to his left knee in 2008, or that the diagnosis he received in 2008 should have put him on notice that he was suffering from cumulative trauma at that time, then under *Phillips*, we would conclude Ragland's current cumulative trauma inju- months earlier.

ry to his left knee is time barred. However, if the evidence is conflicting on what caused the 2008 left knee injury, or on whether Ragland's 2008 diagnosis should have put him on notice that he was suffering from cumulative trauma at that time, then we must conclude that a fact issue exists concerning when the left knee injury accrued.

 We agree with BNSF that when a plaintiff is aware that he has suffered a work-related injury, his cause of action will still accrue at the time of the injury even if he may not be aware of all of the possible future damages he will suffer from the injury. *See, e.g., Roberts v. Lain,* 32 S.W.3d 264, 270 (Tex.App.–San Antonio 2000, no pet.) (plaintiff's claim for mental damages was barred by limitations, where he began suffering physical ailments in 1971 from his continual exposure to toxic chemicals, but claimed he did not realize the exposure was also causing him to suffer from mental issues until two decades later). Merely because a plaintiff suffered separate damages from the same injury, which manifested at different times, does not result in separate causes of action. Therefore, a plaintiff's cause of action begins to accrue when the first symptoms of the injury manifest itself, regardless of whether new symptoms manifest in the future. *Id.*

 However, if a plaintiff suffers two separate and distinct injuries, which are unrelated and which stem from two separate and distinct causes, the plaintiff will have two separate causes of action, and the statute of limitations will begin to run at different times for each injury—even if, by coincidence, the injuries are to the same body part. The court's holding in *Wells v. Union Pac. R.R. Co.,* 2008 WL 4179265 (E.D.Tex.2008), illustrates this point. In *Wells,* a railroad employee suffered a shoulder injury in 1998, and filed a claim

and received compensation. In 2007, the employee filed a new lawsuit, claiming that he had suffered a cumulative trauma injury to the same shoulder, which became symptomatic in 2004. The railroad sought summary judgment, claiming, among other things, that the second lawsuit was time barred because the employee's 2004 shoulder injury stemmed from the same cause as his 1998 shoulder injury, *i.e.,* cumulative trauma that began in 1998.

The plaintiff in *Wells* testified during his deposition that he had a lingering "stiffness" in his shoulder following his 1998 accident, but in response to the railroad's summary judgment motion, the employee attached an affidavit in which he clarified that the stiffness he felt in his shoulder was of a different nature than the "sharp pain" that he felt in his shoulder in September 2004 when he first sought medical treatment for what he considered to be a new injury. *Id.,* at **4, 6. The plaintiff further pointed out that after receiving medical attention for his 1998 injury, he was released to full duty work, and the evidence established that he had no medical complaints about his shoulder until years later in 2004. The trial court rejected the railroad's argument that the plaintiff's summary judgment affidavit contradicted his deposition testimony, and instead concluded that the affidavit simply "supplement[ed]" the plaintiff's deposition testimony, and served to explain the plaintiff's position that the "stiffness or soreness he felt following his 1998 injury [was] different than the pain that caused him to go see the doctor in 2004." *Id.,* at *6. Noting that the medical records supported the plaintiff's statement that he did not seek medical attention for any shoulder pain between the time of his 1998 injury and September 2004, the trial court concluded a fact issue remained whether the two injuries were related and when the plain-

tiff knew or should have known of his shoulder injury and its cause. *Id.*, at *7; *see also Fonseca v. Consol. Rail Corp.*, 246 F.3d 585, 591–92 (6th Cir.2001) (fact issue existed whether the temporary pain that the plaintiff felt in his hands while working with power tools from the late 1960's to the early 1990's differed in kind from the plaintiff's persistent pain from cumulative trauma which he began to feel in the mid-1990's, thereby precluding summary judgment).

 BNSF seeks to distinguish *Wells* by arguing that Ragland's own medical evidence conclusively established the two injuries were related, and that Ragland knew or should have known that his left knee pain in 2008 was in fact caused by cumulative trauma rather than an acute event or accident. In particular, BNSF points out that Ragland's treating physician noted in his "progress note" from Ragland's follow-up visit on July 3, 2008 that Ragland had been experiencing "symptoms" of knee pain for a year prior to that time, and that Ragland believed that his symptoms were work-related. BNSF contends that these notes clearly indicate that Ragland knew or should have known that he was suffering from a pre-existing work-related cumulative trauma injury at that time, rather than an acute injury.

BNSF's summary of the doctor's note, however, is incomplete. In this same progress note, the doctor stated that Ragland presented for a "follow up of left knee with internal derangement," and that Ragland reported "onset of pain while he was doing his job," that he felt a "pop to his knee," and that he also felt "instability to his kneecap." Further, a "progress note" from Ragland's first office visit on June 26, 2008, also indicated that Ragland consistently reported that he had "stepped out of a truck and landed wrong on his leg and

heard a popping sound." As well, in the operative report from Ragland's 2008 meniscus repair surgery, his surgeon stated that Ragland had "injured his knee and has had discomfort since then." Thus, the medical records indicate that Ragland and his doctors associated Ragland's 2008 meniscus tear with the acute event that occurred on June 26, 2008. Since no testimony from Ragland's doctors was provided as summary judgment evidence, there is no evidence that conclusively establishes the exact cause of his 2008 injury with any medical certainty.

BNSF also points to Ragland's 2008 post-operative report, which stated that the surgeon found "areas of chondromalacia," and the presence of "[p]athologic plica," both of which BNSF contends are associated with "repetitive stress" or "use-type etiology." BNSF, however, presented no medical testimony or evidence to support this contention. Moreover, a brief review of the medical literature reveals that chondromalacia is not necessarily the result of repetitive stress, and is instead a condition that may result from genetic causes, such as "degeneration of cartilage due to poor alignment of the kneecap (patella) as it slides over the lower end of the thighbone[.]" *See* Medicine.Net.com, Chondromalacia Patella, www.medicine.net.com/patellofemoral-syndrome/article.htm. (last visited Sept. 13, 2016). In addition, the medical literature suggests that the "etiology of symptomatic plica is unclear," and that "[p]otential causes" of plica syndrome include not only repetitive stress, but "single blunt trauma" as well as "meniscal tears[.]" *See,* Emedicine.MedScape.com, Plica Syndrome, Etiology, http://emedicine.medscape.com/article/1252011-overview#a 8 (last visited Sept. 13, 2016). Further, we note that the x-ray report taken prior to Ragland's surgery on June 30, 2008 indicated that there were no signs of any

"significant degenerative changes." As such, we disagree with BNSF that the medical record provides conclusive proof that Ragland's 2008 injury was the result of cumulative trauma, as opposed to an acute accident or event.[11]

Moreover, we find it telling that during the recorded interview that Ragland had with a BNSF claims representative in October 2008, when Ragland settled his claim for his 2008 injury, the BNSF representative repeatedly referred to Ragland's knee injury as resulting from an "accident" and explained to Ragland that the release he was signing released BNSF from all liability for the injuries he suffered as the result of the "accident of June 26th, 2008[.]" Never once during the interview does the claims representative refer to Ragland's injury as resulting from cumulative trauma, nor has BNSF presented any evidence to suggest that either of the parties considered Ragland's injury to have resulted from cumulative trauma at that time. Accordingly, we conclude that, at this stage of the proceedings, there remains a fact issue whether Ragland's 2008 meniscus tear in the left knee was the result of the same cumulative trauma that caused Ragland's 2010 meniscus tear, and whether Ragland knew or should have known at the time of his diagnosis in 2008 that his left knee injury was the result of cumulative trauma, as opposed to an acute event.

■ Similarly, we also conclude a fact issue remains regarding when Ragland began experiencing pain in his left knee related to his cumulative trauma injury that

resulted in his 2010 knee surgery. As Ragland points out, the undisputed medical evidence indicated that the meniscus repair that was done in 2008 was successful, that Ragland suffered no complications from the surgery, and that he was returned to work "full duty" with no restrictions beginning in September 2008. Further, Ragland consistently stated in his two interviews with BNSF claims representatives, both in October 2008 and August 2010, that he was generally free of pain following his 2008 surgery, that he had been released to work full duty after the surgery, and that he had no issues performing his job after the 2008 surgery. While Ragland did acknowledge in his 2008 recorded interview, as well as in his deposition, that he had a little pain and soreness following his 2008 surgery, there is nothing in the record establishing that these symptoms stemmed from anything other than typical post-surgical soreness, as Ragland himself believed, or that it would have put Ragland on notice that he was suffering from a new injury caused by cumulative trauma. *See Granfield v. CSX Transp., Inc.,* 597 F.3d 474, 483 (1st Cir. 2010) ("de minimis aches and pains are not considered to be an injury for the purposes of the FELA statute of limitations").

As in *Wells,* Ragland also explained in his summary judgment affidavit that the post-surgical discomfort he experienced following his July 2008 surgery was "very distinct" from the pain he began experiencing in 2010, and that he did not realize until March 2010 that he was experiencing

---

11. BNSF also points out that Ragland asserted, without explanation, that the 2008 postoperative report from his left knee surgery indicated there was some "indicia of wear-out type problems on that left knee," which BNSF interprets to be a judicial admission that Ragland was suffering from work-related cumulative trauma at that time. We disagree. The medical literature reveals that degenera-

tive changes may result from a variety of causes in addition to repetitive stress, including the aging process and heredity. *See* WebMD, Osteoarthritis of the Knee (Degenerative Arthritis of the Knee) http://www.webmd.com/osteoarthritis/guide/ostearthritis-of-the-knee-degenerative-arthritis-of-the-knee (last visited Sept. 13, 2016).

cumulative trauma to his knees from his work. BNSF, however, labels this affidavit as conclusory and self-serving, and cites a series of cases in which courts have held that conclusory statements in summary judgment affidavits do not raise fact issues. *See, e.g., Ryland Group v. Hood,* 924 S.W.2d 120, 122 (Tex.1996) (per curiam) (conclusory affidavits are not sufficient to raise fact issues to defeat a motion for summary judgment, as a conclusory affidavit does not present "probative evidence of the facts at issue"); *see also Lindley v. McKnight,* 349 S.W.3d 113, 126 (Tex.App.– Fort Worth 2011, no pet.) (conclusory statements in a summary judgment affidavit are not considered proper summary judgment proof, and do not provide sufficient underlying facts to defeat a motion for summary judgment). We disagree. As in *Wells,* Ragland's affidavit merely explains the distinction between the pain he felt post-surgically from the 2008 meniscus repair and the pain that he felt in 2010 when he suffered his second meniscus tear. Further, as in *Wells,* Ragland's medical records are consistent with this explanation, as they indicate that Ragland did not complain of any pain in his left knee until July 26, 2010, almost two years after his June 26, 2008 injury. As such, we conclude a fact issue exists regarding when Ragland knew or should have known that he was suffering from a cumulative trauma injury to his left knee and that the trial court erred in granting summary judgment on that cause of action.

## The Negligent Work Assignment Claim

Ragland also contends the trial court erred in granting summary judgment on his cause of action for negligent work assignment. We disagree.

### Applicable Law and Standard of Review

The FELA authorizes an injured railroad employee to recover damages from his employer for injury or death resulting in whole or in part from the railroad's negligence. *Rivera v. Union Pac. R.R. Co.,* 378 F.3d 502, 507 (5th Cir. 2004) (citing 45 U.S.C. § 51). The ultimate question is whether the railroad exercised reasonable care in creating a reasonably safe working environment. *Id.* (citing *Urie,* 337 U.S. at 179 n. 16, 69 S.Ct. 1018). The railroad's duty to create a reasonably safe work environment encompasses a duty to assign an employee to work for which he or she is reasonably suited. *Id.* (citing *Emmons,* 701 F.2d at 1120). The railroad breaches that duty if it negligently assigns an employee to perform work beyond his physical capacity, or, in other words, if the railroad knew or should have known of the employee's diminished work capacity and, despite that knowledge, continued to assign the employee to tasks that it knew or should have known would aggravate his physical condition. *Id.* However, the railroad is not an insurer of its employees' safety. *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994). Therefore, the railroad generally has no duty to ascertain whether an employee is fit for a particular job, absent notice to the contrary. *See, e.g., Fletcher,* 621 F.2d at 909.

The test for causation under FELA is more relaxed than the common law standard of proximate cause, and centers on whether the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *BNSF Ry. Co. v. Nichols,* 379 S.W.3d 378, 382 (Tex.App.– Fort Worth 2012, pet. denied) (citing *CSX Transp., Inc. v. McBride,* 564 U.S. 685, 131 S.Ct. 2630, 2636, 180 L.Ed.2d 637 (2011)). Despite the lower burden under FELA, however, a plaintiff still bears the burden

of presenting evidence from which a jury could reasonably conclude the existence of a probable or likely causal relationship as opposed to merely a possible one. *Id.* (citing *Abraham v. Union Pac. R.R.*, 233 S.W.3d 13, 17 (Tex.App.–Houston [14th Dist.] 2007, pet. denied)).

 When, as here, a party moves for both a traditional and a no-evidence summary judgment, an appellate court typically first reviews the trial court's summary judgment under no-evidence standards. *Hall v. RDSL Enters. LLC*, 426 S.W.3d 294, 300 (Tex.App.–Fort Worth 2014, pet. denied) (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004)). Once a no-evidence summary judgment motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). Although the nonmoving party is not required to marshal its proof, it must present countervailing evidence that raises a genuine fact issue on the challenged elements. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). When reviewing a no-evidence summary judgment, we review the evidence presented in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks*, 206 S.W.3d at 582 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005)); *see also Hall*, 426 S.W.3d at 299–300.

## Analysis

In making our analysis, we note that Ragland does not argue that BNSF was negligent when it first assigned him to

work on the pregauger machine on the morning of August 2, 2010. To the contrary, Ragland acknowledges that the only injury BNSF would have been aware of that morning was his 2008 meniscus tear in his left knee, which had already been surgically repaired, without complications, and that he had no work restrictions in his file at that time relating to his 2008 surgery, as he had been fully cleared to work. Further, Ragland acknowledges that he had failed to disclose to BNSF any time prior to August 2 that he had been diagnosed with a meniscus tear in his right knee, or that he was experiencing pain in either of his knees. Instead, Ragland's sole basis for his negligent assignment of work claim is that BNSF was obligated to take him off the pregauger machine after he informed one or both of his supervisors later that day that he had been diagnosed with a meniscus tear in his right knee and that the pregauger was causing him pain.[12] Even assuming that a railroad can be held liable for a negligent work assignment claim based on these circumstances, we conclude that there are several problems with Ragland's claim that render the trial court's order granting summary judgment correct.

 It is undisputed that Ragland began working on the pregauger machine around 4 a.m. on August 2, 2010. Both parties also agree that at approximately 10 a.m., after working on the machine for almost six hours without any objection or complaint, Ragland had a conversation with ADMP Matthew Keller when Keller first arrived at the job site. The parties agree that during this conversation, Ragland informed Keller that he had recently been diagnosed with a meniscus tear in his right knee, and that he anticipated having

---

**12.** In his brief, Ragland clarified that his negligent assignment claim is related only to the injury to his right knee, rather than his left knee.

surgery on that knee in the near future. Ragland contends that this conversation, standing alone, was sufficient to inform Keller that he had a work limitation and that it triggered a duty on BNSF to reassign him to a different task. We disagree.

A plaintiff is required to demonstrate more than that the railroad was aware that he had previously sustained an injury requiring medical care. *Danko v. Union Pac. R.R. Co.*, CIV A 4:05–CV–153–BE, 2007 WL 1854059, at *2–3 (N.D.Tex. June 28, 2007) (although defendant railroad knew that FELA plaintiff had previously undergone surgery on his shoulder and for carpal tunnel syndrome, where plaintiff failed to request a different work assignment to reduce the stress to his shoulder and arms after returning to work, railroad was not liable on theory of negligent work assignment when plaintiff's symptoms returned). Instead, the plaintiff must demonstrate that he expressly informed his employer that his work was causing him problems. *See, e.g., Emmons*, 701 F.2d at 1121 (where railroad employee requested a transfer, but did not disclose that he was seeking the transfer due to medical reasons, the railroad could not be held liable on a negligent assignment of work claim); *Wells*, 2008 WL 4179265, at *8 (summary judgment was proper on plaintiff's negligent assignment claim where the evidence demonstrated only that the railroad was aware that the plaintiff had previously had shoulder surgery for which he had been released to work, but no evidence existed that plaintiff asked for a different work assignment upon returning to work or that he otherwise made the railroad aware that the job he was assigned to exceeded his physical capacity); *Mercier v. Texas & N.O.R. Co.*, 293 S.W.2d 80, 85 (Tex.Civ.App.–Beaumont 1956, writ ref'd n.r.e.) (directed verdict was proper on plaintiff's negligent assignment

claim where plaintiff presented no evidence that he requested to be relieved from further work or requested a change in assignment).

Moreover, even if we were to accept as true the statements that Ragland made in his summary judgment affidavit that at 10 a.m. he also informed his two supervisors, Bankston and Keller, that working on the pregauger was causing him "severe pain," and that it was "killing" his knees, this was insufficient to defeat BNSF's no-evidence summary judgment motion. In fact, Ragland's own description in his affidavit of the history of his right knee pain and the events of August 2, 2010 serve to defeat his argument that his injuries were caused by, or even aggravated by, BNSF's actions that day—instead, they clearly indicate that Ragland's injuries started well in advance and certainly before he informed his supervisors of his pain.

First, we find it significant that Ragland acknowledged in his affidavit that he had already been diagnosed in March 2010 with a meniscus tear in his right knee, four months before he reported to work on August 2, 2010, and that he admittedly knew he was in need of surgery to repair that tear. Further, Ragland is now characterizing that injury as solely the result of work-related cumulative trauma, and he further acknowledges that the cumulative trauma began eight months earlier. As such, Ragland's only possible claim against the railroad for its actions at the job site on August 2, would be that his supervisor's failure to take him off the pregauger machine at 10 a.m. caused him *additional* injury or an *aggravation* of his pre-existing injury. *See Billman*, 825 S.W.2d at 528–29 (to recover for "aggravation" of an earlier work-related hearing loss, plaintiff was required to plead and prove that he suffered additional injury to his hearing

and that the railroad's negligence caused the additional injury). Ragland, however, failed to plead aggravation or to present any evidence to demonstrate that operating the pregauger for any length of time on August 2 aggravated his pre-existing injury—let alone for the two and a half hours that he operated the machine after allegedly informing his supervisors that he was experiencing any pain.

More importantly, Ragland's own affidavit indicates that the level of pain he allegedly reported to his supervisors at 10 a.m. that morning (*i.e.*, that he was in "severe pain," and that his knees were "killing" him) was exactly the same level of pain that he reported to Bankston at 12:30 p.m. when he told Bankston that the pregauger was "killing" his knees. As BNSF points out, the facts as described by Ragland's own affidavit indicate that it was too late to change Ragland's outcome by the time he reported his "severe pain" to his supervisors, whether it was at 10 a.m. or two hours later at 12:30 p.m. As such, there is no evidence that BNSF's alleged negligence in failing to take Ragland off the machine earlier that day was the cause of any additional injury to Ragland.[13] *See, e.g., BNSF Ry. Co. v. Nichols*, 379 S.W.3d 378, 382 (Tex.App.–Fort Worth 2012, pet. denied) (the causal link between an event sued upon and the plaintiff's injuries must be shown by competent evidence); *see also Acosta*, 449 S.W.3d at 894–95 (plaintiff did not show that the "aggravation rule" applied where he acknowledged that he was originally injured in an accident in 2005, and he failed to demonstrate that the railroad committed any "new separate tort" that aggravated or contributed to his injury).

We conclude the trial court properly granted summary judgment on Ragland's negligent work assignment claim.

### CONCLUSION

We affirm the trial court's order to the extent it granted summary judgment to BNSF on Ragland's negligent work assignment cause of action, because there is no evidence to support that claim. However, we reverse the trial court's order to the extent it granted summary judgment to BNSF on Ragland's causes of action for the cumulative trauma injuries to both his right and left knees, because a genuine issue of material fact exists on when those causes of action began to accrue. We therefore remand to the trial court for further proceedings consistent with this opinion.

---

**13.** It likewise follows that although the trial court abused its discretion in striking Ragland's statement in his affidavit that he complained about his knees to Bankston and Keller at 10 a.m., that error was harmless because it had no impact on the trial court's decision to grant summary judgment on Ragland's negligent work assignment.