COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



EP HOTEL PARTNERS, LP and
SPOKANE EQUITIES LIMITED
PARTNERSHIP, LTD.,

Appellants,

v.

CITY OF EL PASO, MAYOR OSCAR
LEESER, CITY REPRESENTATIVES
EMMA ACOSTA, CARL L. ROBINSON,
MICHIEL R. NOE, COURTNEY C.
NILAND, ANN MORGAN LILLY,
LARRY ROMERO, CLAUDIA ORDAZ,
LILY LIMON, and EP VIDA, LLC,

Appellees.

§
§
§
§
§
§
§
§
§
§

No. 08-16-00031-CV

Appeal from the

County Court at Law No 5

of El Paso County, Texas

(TC# 2014DCV0727)

## **O P I N I O N**

Appellants, who are owners and operators of existing hotels located near the El Paso International Airport, filed suit against the City of El Paso, its elected representatives (collectively referred to as the "City"), and a private third party, EP Vida, LLC (EP Vida). Appellants claimed that the City violated its charter by entering a lease with EP Vida, later amended, for the construction and operation of a new hotel and retail center on city property located near Appellants' hotels. This is an appeal from an order granting summary judgment in favor of the City and EP Vida, jointly, in which the trial court dismissed Appellants' lawsuit seeking a

declaration pursuant to the Uniform Declaratory Judgment Act (UDJA), that the City violated the El Paso City Charter when it entered the lease with EP Vida, and that the City representatives acted in an ultra vires manner by approving it. Appellants assert that the trial court erred in granting summary judgment in favor of Appellees, arguing that they presented sufficient evidence to raise genuine issues of material fact on the question of whether the lease violated the City Charter, and on the question of whether the representatives acted in an ultra vires manner. We affirm.

## FACTUAL BACKGROUND

The undisputed facts in this case reveal that prior to May of 2013, the City worked on redeveloping a parcel of land it owned that was located near the El Paso International Airport (hereinafter the "airport"). Staff working on the project included individuals from both the airport and economic development departments of the City. At the time, the property at issue had become "blighted," as it contained an abandoned building that had stood vacant since 2002 or earlier, and squatters had become an issue of concern.

The City hired a third-party appraiser to provide a fair market value determination of the parcel of land. Ordinarily, based on the appraised value, the City would then charge eight percent of the appraised value times the length of the lease in years to determine the lease rate for the property. To begin the redevelopment of this parcel, however, the City believed it needed to offer "incentives," in the form of temporary rental abatements, to induce a hotel developer to build on the site.

In May of 2013, the City entered a forty-year lease agreement with EP Vida that provided for EP Vida to begin construction, within sixty days from the issuance of a building permit, and complete construction within thirty-six months of the lease signing, El Paso's first four-star hotel,

2

together with a retail center and public right of way included on the property.[1]   The terms of the lease agreement, relevant to this appeal, provided that the rent for the hotel site would be set at a minimum annual guarantee rental amount, or "MAG" rent, for the first fifteen years of the lease, which was set at 0.49 cents per square foot; thereafter, in the year 2028, EP Vida would be required to pay either the MAG rent, which was then set at eight percent of the fair market value of the site less improvements, or rent based on a certain percentage of the hotel's gross revenue ("Hotel Percentage Revenue"), whichever was greater.[2]   Additionally, the lease provided for periods of rent abatement under two provisions:   first, to account for a period of design and construction, EP Vida would not be required to pay any rent during the first thirty-six months of the lease, or until a certificate of occupancy was issued for the hotel, whichever occurred first; and second, from the beginning of the lease to the fifteenth anniversary, or year 2028, the provision requiring payment of a percentage of hotel revenue, when greater than MAG, would also be abated.

City staff calculated that, when viewing the EP Vida lease over the course of its forty-year term, the City would recoup or "catch up on" any deficiencies that might occur in the earlier stages of the lease—due to the incentives offered—by the end of the term, and that the City would in fact receive more than fair market rent for the property over the term of the lease.   The City asserted that, even though fair market value for rent for the hotel site over a forty-year term would ordinarily have been less than $10 million, it projected that EP Vida would pay more than double that amount

---

[1] The City adopted a resolution authorizing the City to enter into the lease on that same day.   The lease contained an exhibit setting forth the national standards for four-star hotels by which EP Vida agreed to abide.

[2] The hotel percentage revenue rent, which was only applicable to the hotel site, was set at five percent of revenue from room rentals, four percent of revenue from alcoholic beverage sales, two percent of revenue from food sales, and six percent of revenue from miscellaneous sales, annually.

due to the City capturing the fair-market-value rent and a percentage of gross revenue from year sixteen onward to the end of the lease.

### *Appellants' Lawsuit*

On March 5, 2014, Appellants, as the owners and operators of airport hotels located on land leased from the City, filed a lawsuit naming both EP Vida and the City of El Paso, in which they sought a declaratory judgment under the UDJA that the EP Vida Lease was void and unenforceable on the basis that it violated the El Paso City Charter.[3] Appellants claimed that the lease violated Section 3.18 of the El Paso City Charter (hereinafter the "City Charter"), which provides that: "Any ordinance providing for the conveyance, lease, or grant of a franchise regarding the property of the City shall provide for payment to the City of a reasonable fee as consideration for that conveyance, lease, or franchise" (hereinafter the "reasonable fee" provision). Appellants argument challenging the lease centered on the two periods of "rent abatement," i.e., the initial thirty-six month rent deferral, and the fifteen-year period of deferral of the imposition of the hotel percentage revenue rent provision, when greater than MAG, until after 2028. Appellants argued that because of the inclusion of these rental abatements, the City was not charging a "reasonable fee" as required by the Charter. Appellants later added the City Representatives as defendants in their lawsuit in their Second Amended Petition, alleging that they acted in an ultra vires manner when they approved the lease, due to the lease's alleged violation of

---

[3] Appellant EP Hotel is a Texas limited partnership that owns and operates the Radisson Hotel, located on City property adjacent to the airport pursuant to a city approved sublease with a third party that contains the original term of a main lease with the City for a term of forty years (1982-2022). Appellant Spokane Equities is an Arizona limited partnership that owns and operates the Wyndham Airport Hotel, which is also located on City property adjacent to the airport pursuant to a lease with the City that includes an initial term of forty-six years (9/1987-6/2034), followed by an optional term of an initial thirty years.

4

the City Charter. In response, both EP Vida and the City, filed counterclaims, seeking a declaration under the UDJA that the lease was valid and enforceable.

### *The First Amended Lease*

Because of the ongoing litigation with Appellants, EP Vida was unable to meet initial obligations under the Original Lease in a timely manner. In light of this delay, the City Council passed a resolution dated December 15, 2015, authorizing the City to enter into an amended lease with EP Vida, which was signed and became effective that same day (hereinafter the "Amended Lease"). In the Amended Lease, the hotel site was replatted to more accurately reflect the scope of the hotel site,[4] and EP Vida again agreed to construct a four-star hotel, and to pay a minimum annual guarantee rental amount, or "MAG" rent, at the same rate of .49 cents per square foot per year until 2028, with adjustments made for increases in the Consumer Price Index. Thereafter, in 2028, the MAG rent would readjust to a rate equal to eight percent of the fair market value of the hotel site less improvements. The Amended Lease also called for a 100 percent abatement of the MAG rent until May 28, 2016, or until a certificate of occupancy was issued for the hotel, whichever occurred first. In addition, in 2028, the hotel percentage revenue provision became effective, and EP Vida would be required to pay the MAG rate or the hotel percentage revenue provision, whichever amount was greater. As well, the Amended Lease imposed specific requirements on EP Vida to construct and maintain an open space on the premises to include a park pond and a private street.

### *The Motions for Summary Judgment*

---

[4] With replatting, the total square footage of the hotel site increased from 90,787.72 sq. feet to 129,966.25 sq. feet of land, in comparison between the Original Lease and the Amended Lease.

On June 12, 2015, six months before the parties signed the First Amended Lease, EP Vida and the City filed a joint no-evidence motion for summary judgment, seeking dismissal of Appellants' claims against them, arguing that Appellants had no evidence that the EP Vida Lease violated the City Charter. In addition, both the City and EP Vida filed traditional motions for summary judgment on their counterclaims, seeking a declaration that the EP Vida Lease was valid and enforceable.

In their written response, which was based on the original EP Vida Lease, Appellants pointed out that the City admitted in one of its discovery responses that it did not use any specific criteria for determining what would constitute a "reasonable fee" for hotel leases on City property adjacent to the airport. However, Appellants argued that the City had in effect defined that term by the policies or practices it had previously followed when it structured rent in other airport hotel leases, and submitted evidence from other hotel owners and operators regarding the manner in which the City had structured rent in their leases. Appellants asserted that this evidence demonstrated that the City's "practice," as reflected in these other leases, was to require airport hotel lessees to "pay market rent in the form of fixed ground rent based on appraised value and percentage rent, or just percentage rent, without any abatement[s]." In their written pleadings, Appellants argued that the EP Vida Lease did not contain a "reasonable fee," as required by the City Charter because it deviated from its past practices, in part because it contained the following two rental abatement provisions, not found in other airport hotel leases: (1) the initial thirty-six-month rental abatement in that lease; and (2) the abatement of the hotel percentage revenue provision until the 15th anniversary of the lease, in 2028.

6

In addition, at the summary judgment hearing, Appellants pointed to the deposition testimony of the City's Director of Aviation, Monica Lombrana, in which she stated that the City typically sets MAG rent at eight percent of fair market value, but that the City had decided to set MAG rent at seven percent during the initial years of the EP Vida Lease, and to delay setting it at eight percent until the year 2028.[5] Appellants argued that the failure to use the same criteria for setting MAG rent, as it did in other airport hotel leases, in the initial years of the EP Vida also violated the City Charter's "reasonable fee" requirement.

The trial court disagreed with Appellants' arguments, and granted both summary judgment motions filed by the City and EP Vida, dismissing all of Appellants' claims, and granting judgment on the counterclaims filed by the City and EP Vida. This appeal followed.

## DISCUSSION

Although Appellants purport to raise five separate issues on appeal, their argument is really comprised of two separate, but related arguments.[6] In effect, Appellants argue that the trial court erred when it granted summary judgment in favor of the City and EP Vida, contending that they presented sufficient evidence to raise a genuine issue of material fact on the following two issues: (1) whether the EP Vida Lease violated the City Charter by not requiring a "reasonable fee," and (2) whether the City Council members therefore acted in an ultra vires manner by approving the

---

[5] In her testimony, Lombrana explained that in her current position as the City's Director of Aviation, she is responsible for overseeing the land holdings that the City has "in terms of the non-aviation development," and to ensure that the City complies with all federal regulations when entering into any development agreements. At the time the EP Vida Lease was first negotiated and signed, she was employed in the City's planning and development division.

[6] In particular, Appellants first four arguments center on whether they raised a genuine issue of material fact that precluded the trial court from granting any of the City's summary judgment motions, and in its fifth issue, Appellants argue that the trial court's final judgment should be reversed. Appellants, however, do not address these issues separately, and instead only include one argument section in their brief.

7

lease.[7]   We disagree with both arguments, and conclude that the trial court properly granted summary judgment in favor of the City and EP Vida.

### *Standard of Review*

When, as here, a party moves for both no-evidence summary judgment and a traditional summary judgment, an appellate court typically first reviews the trial court's summary judgment under no-evidence standards.   *Stierwalt v. FFE Transp. Services, Inc.,* 499 S.W.3d 181, 194 (Tex. App.--El Paso 2016, no pet.) (citing *Hall v. RDSL Enters. LLC*, 426 S.W.3d 294, 300 Tex. App.--Fort Worth 2014, pet. denied)); *see also Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004).   In a no-evidence summary judgment motion, the defendant alleges that adequate time for discovery has passed and that the plaintiff has failed to produce any evidence to support one or more essential elements of a claim for which the plaintiff would bear the burden of proof at trial. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015); TEX. R. CIV. P. 166a(i).   Once such a motion is filed, the burden shifts to the nonmoving party to present more than a scintilla of evidence raising an issue of material fact as to the elements specified in the motion.   *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006); *see also Stierwalt,* 499 S.W.3d at 194.   More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.   *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003).   If conflicting inferences may be drawn from the evidence submitted by the non-movant party, a fact issue is presented.   *Randall v. Dallas Power & Light Co.,* 752 S.W.2d 4, 5 (Tex. 1988); *Gaines v. Hamman,* 163 Tex. 618, 626, 358 S.W.2d 557, 562 (1962).   However, if

---

[7] We note that many of the arguments made by Appellants in the trial court for finding the EP Vida Lease to be violative of the City Charter referred to the provisions found in the original EP Vida Lease.   That lease, however, is no longer in effect, and therefore, we concern ourselves solely with the provisions found in the 2015 Amended Lease.

8

the non-movant fails to meet its burden of establishing a genuine issue of material fact on each challenged element of its claims, the trial court must grant a no-evidence summary judgment motion. TEX. R. CIV. P. 166a(i); *Ridgway,* 135 S.W.3d at 600; *Hamilton v. Wilson,* 249 S.W.3d 425, 426 (Tex. 2008).

On appeal, both no evidence and traditional motions for summary judgment are reviewed de novo. *See Valence Operating Company v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005); *Harris v. Ebby Halliday Real Estate, Inc.*, 345 S.W.3d 756, 759-60 (Tex. App.--El Paso 2011, no pet.); *see also KCM Fin. LLC*, 457 S.W.3d at 79 (appellate court reviews a trial court's order granting summary judgment de novo). In conducting this review, we consider the summary judgment evidence in the light most favorable to the non-movant, "crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex. 2009). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *See Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex. App.--El Paso 2004, no pet.). All reasonable inferences, as well as all reasonable doubts, must be resolved in favor of the non-movant. *See Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99; *see also Mack Trucks,* 206 S.W.3d at 582 (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005)). Although the nonmoving party is not required to marshal all of its proof in response to a summary judgment motion, it must submit countervailing evidence that raises a genuine fact issue on the challenged elements. *See Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *see also Stierwalt*, 499 S.W.3d at 194. A trial court is "not required to search the record for evidence raising a

material fact issue without more specific guidance from [the respondent]." *See Blake v. Intco Invs. of Tex., Inc.,* 123 S.W.3d 521, 525 (Tex. App.--San Antonio 2003, no pet.).

## ANALYSIS

### *What Constitutes a Reasonable Fee?*

We start our discussion by recognizing that the Texas Constitution allows cities to engage in business dealings with private entities, subject to the following limitation:

> No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or *donation* to the same, or in anywise loan its credit; but this shall not be construed to in any way affect any obligation heretofore undertaken pursuant to law or to prevent a county, city, or other municipal corporation from investing its funds as authorized by law.

TEX. CONST. ART. XI, § 3 (emphasis added).

The City of El Paso is a home rule city[8] existing under Article XI, Section 5 of the Texas Constitution. TEX.CONST. art. XI, § 5; TEX.LOCAL GOV'T CODE ANN. § 5.004 (West 2008).

As the Texas Supreme Court has recognized, although this provision prohibits cities from making donations to private businesses, it nevertheless allows cities to engage in business dealings with private entities and to make expenditures for the direct accomplishment of a legitimate public and municipal purpose; further, the Court has ruled that such dealings are not rendered unlawful by the mere fact that a privately owned business may benefit by such dealings.[9] *See Barrington*

---

[8] A municipality is a home-rule municipality if it operates under a municipal charter that has been adopted or amended as authorized by Article XI, Section 5 of the Texas Constitution. TEX.LOCAL GOV'T CODE ANN. § 5.004 (West 2008); s*ee Moreno v. City of El Paso,* 71 S.W.3d 898, 901 (Tex. App.--El Paso 2002, pet. denied) (stating that the City of El Paso is a home rule city existing under Article XI, Section 5 of the Texas Constitution).

[9] In her deposition testimony, Monica Lombrana, the City's current Director of Aviation, recognized this principle when she explained that the City is not allowed to "subsidize" private businesses and is therefore not entitled to dispose of City property without compensation.

10

*v. Cokinos,* 338 S.W.2d 133, 140 (Tex. 1960); *see also City of Corpus Christi v. Bayfront Associates, Ltd.,* 814 S.W.2d 98, 105 (Tex. App.--Corpus Christi 1991, writ denied) (recognizing that although a municipality has the ability to contract with a private corporation, which may in fact benefit the corporation, the Constitution prohibits it from appropriating or donating funds to private corporations); *see generally City of Lubbock v. Phillips Petroleum Co.,* 41 S.W.3d 149, 161 (Tex. App.--Amarillo 2000, no pet.) (finding that a fee charged by the City to a private entity for an easement was not so low that it violated the constitution's prohibition against donating property to private businesses). Thus, there is no question that a city must obtain some form of compensation when it leases its property to private entities, and the El Paso City Charter's "reasonable fee" requirement is, of course, reflective of this principle. Yet, the Charter does not simply prohibit the City from donating property to private businesses, and instead requires the City to "provide for payment … of a reasonable fee as consideration for [a] conveyance, lease, or franchise." The term, "reasonable fee," however, is undefined in the Charter itself and there is nothing in the record to indicate that the City has any written policy that would provide any guidance on how that term should be defined.[10]

In the absence of any such definition, we must construe the term applying the general rules of statutory construction. *See Bd. of Adjustment v. Wende,* 92 S.W.3d 424, 430 (Tex. 2002) (court applies the same rules of statutory construction to construe municipal ordinances as it does to construe state statutes). In applying these rules, our primary objective is to ascertain and give

---

[10] In their brief, Appellants suggest that in the absence of a definition of the term, the question of what is "reasonable" and what constitutes a reasonable fee is a question of fact that should be determined solely by a jury. To the extent that Appellants are arguing that a jury would have been entitled to determine what the City intended when it used the term, "reasonable fee," in the City Charter, we disagree. Statutory construction is a question of law for a court to decide. *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex. 1989); *Holmans v. Transource Polymers, Inc.,* 914 S.W.2d 189, 191 (Tex. App.--Fort Worth 1995, writ denied).

11

effect to the City's intent in using the term, "reasonable fee" in the Charter. *See TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011) (when construing a statute, a court's primary objective is to ascertain and give effect to the Legislature's intent).  To discern that intent, we start with the plain and ordinary meaning of the words used in the Charter, and we will rely on that meaning unless doing so "produces an absurd result." *See Houston Belt & Terminal Ry. Co. v. City of Houston,* 487 S.W.3d 154, 164–65 (Tex. 2016) (citing *Tex. Mut. Ins. Co. v. Ruttiger,* 381 S.W.3d 430, 452 (Tex. 2012)); *see also State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002) (in construing a statute, a court starts with the "plain and common meaning of the statute's words") (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc*., 996 S.W.2d 864, 865 (Tex. 1999)).  If the statutory language is unambiguous, we will interpret the statute according to its plain meaning. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003); TEX. GOV'T CODE ANN. § 311.011(a) (West 2013) (words and phrases are to be construed according to the rules of grammar and common usage).  Moreover, words and phrases that have acquired a technical or particular meaning must be construed accordingly. *City of Galveston v. Texas Gen. Land Office*, 196 S.W.3d 218, 222 (Tex. App.--Houston [1st Dist.] 2006, pet. denied) (citing TEX. GOV'T CODE ANN. § 311.011(b)).

We find guidance in making this determination by looking at how courts have defined the term "reasonable fee" in other contexts, and in particular, we look to how the Supreme Court has defined the term, "reasonable fee" in the context of awarding attorney's fees.  In that context, the Supreme Court looked to the definitions found in various dictionaries, including Black's Law Dictionary, which defines the term, "reasonable," as "fair, proper, or moderate under the circumstances." *See Garcia v. Gomez,* 319 S.W.3d 638, 642 n.3 (Tex. 2010) (citing Black's Law

12

Dictionary 1272 (7th ed.1999)). In adopting this definition, the Court concluded that the term, "reasonable fee," should be defined as "one that is not excessive or extreme, but rather moderate or fair." *Id.*

In addition, we find it significant that the City Charter used the term, "reasonable fee," in conjunction with determining the amount of "consideration" the City must charge a private entity in exchange for the lease or other conveyance of City property. The concept of what is considered reasonable or adequate consideration in a contract, such as a lease agreement, is also measured by the notion of moderation; therefore, a court will not typically find the consideration in a contract to be inadequate unless the consideration given is "so grossly inadequate as to shock the conscience," making it "tantamount to fraud." *See Phillips Petroleum Co.,* 41 S.W.3d at 161 (citing *Cearley v. Cearley,* 331 S.W.2d 510, 512 (Tex. Civ. App.—Dallas 1960, no writ)); *see also Parker v. Dodge,* 98 S.W.3d 297, 301–02 (Tex. App.--Houston [1st Dist.] 2003, no pet.) (in the interest of equity, a court may inquire into the adequacy of a contract if there is such a gross disparity in the relative values exchanged as to show unconscionability, bad faith, or fraud); *Martin v. Martin, Martin & Richards, Inc.,* 12 S.W.3d 120, 125 (Tex. App.--Fort Worth 1999, no pet.) (courts will typically not look beyond the face of a contract unless there is unconscionability, bad faith, or fraud).

Applying these principles to the present case, we conclude that the City's intent in adopting the "reasonable fee" requirement in the City Charter was to require the imposition of a fair or moderate fee in its leases, or stated another way, to prohibit the City from leasing property to private entities for fees that could be considered "grossly inadequate" or so excessively low as to shock the conscience, or to otherwise suggest that the conveyance was made in bad faith or for a

13

fraudulent purpose. We therefore examine the summary judgment evidence presented by Appellants to determine if it raised a genuine question of fact regarding whether the rental structure in the EP Vida Lease failed to meet the "reasonable fee" requirement in the City Charter.

### *Evidence that the City Did Not Use Any*
### *"Specific Criteria" in Calculating Rent in Other Hotel Leases*

The first item of summary judgment evidence upon which Appellants rely is a discovery response submitted by the City in which it stated that it did not utilize any "specific criteria" for determining what constitutes a "reasonable fee" for hotel leases on airport property. Appellants argue that this response "flies in the face" of the City's "reasonable fee" requirement, and "suggests that the City sets lease rates with no rational or reasonable basis," and therefore automatically raised a question of fact on whether the rental abatements in the lease with EP Vida were reasonable. We disagree.

Initially, we note that this argument contradicts the argument that Appellants made in the trial court, and which they renew on appeal, in which they assert that the City did in fact have a "practice" or policy in place with regard to structuring rent in its airport hotel lease from which the City deviated when it included the rental abatements in the EP Vida Lease. In particular, Appellants themselves argue that the City had a "general policy" of setting MAG rent at eight percent of the fair market or appraised value of the hotel site in its airport hotel leases, and of immediately requiring lessees to pay either that MAG amount or the percentage revenue rental amount from the start of the lease.

More importantly, even if we were to conclude that the City did not use any "specific criteria" in setting rental fees for airport hotel leases, this would not cause us to conclude that the

14

City's decision to offer EP Vida rental abatements in its lease was per se unreasonable, as Appellants would have us do. As set forth above, the City Charter only requires the City to include a "reasonable fee" in all of its leases with private parties; it does not prescribe any specific criteria in determining the rent to be charged in a lease agreement, nor does it require the City to use the same criteria in every lease. Simply because the City may find it appropriate to use different criteria in different situations when structuring rental agreements, this does not necessarily mean that the City's decision to offer rental abatements to EP Vida was made without any "rational or reasonable basis," or that it caused the rental obligations in the lease to be grossly inadequate.

In addition, as explained above, the City presented evidence regarding its reasons for including the rental abatements in the lease. In particular, the City's current Director of Aviation, Monica Lombrana, explained in her deposition testimony, as well as in a supplemental affidavit, that the City believed it was necessary to offer rental abatements as an incentive to entice a developer to construct a hotel at what it considered to be a "blighted" parcel of land that had remained vacant for more than ten years. Prior to entering the EP Vida Lease, the City calculated that the City would eventually recoup or "catch up on" any deficiencies that might occur due to initial abatements as additional percentage terms begin in later years and will produce rental revenue.

Appellants, however, argued at the hearing on the motions for summary judgment, as they do on appeal, that we should overlook Lombrana's testimony, as these calculations were based on "pure speculation," unsupported by any evidence. In particular, Appellants argue that the City had no way of knowing whether it would recoup any losses on the front end of the lease, as it was

15

"impossible to accurately" predict what percentage revenues, if any, the hotel might generate in the later years of the lease from 2028 to 2053, noting that it was not even clear that the hotel would actually be constructed and/or be operational throughout the entire term of the lease. Appellants therefore contend that this was "hardly a prudent or acceptable method of calculating a lease rate that is reasonable."

In making this argument, however, Appellants overlook the fact that they shouldered the burden of coming forward with evidence to support their claim that the EP Vida lease did *not* contain a reasonable fee. *See Mack Trucks, Inc.,* 206 S.W.3d at 582 (explaining the non-movants burden in a no-evidence summary judgment motion). Appellants, however, presented no evidence to suggest that the City's calculations were in error, or that the City faced an unreasonable risk of not recouping any losses they might suffer in the first years of the lease due to the incentives provided in the lease.

Further, although Appellants argue that the City's decision to include rental abatements in the EP Vida Lease was not a "prudent or acceptable" method of calculating rent in a commercial lease, Appellants presented no evidence to support that assertion in the trial court; in particular, none of the affidavits they presented from the hotel owners and operators addressed this particular point, and they presented no expert witness testimony on that subject. Instead, Appellants rely solely on the arguments their counsel made at the summary judgment hearing—arguments that clearly do not constitute competent summary judgment evidence. *See generally Freeman Fin. Inv. Co. v. Toyota Motor Corp.,* 109 S.W.3d 29, 32–33 (Tex. App.--Dallas 2003, pet. denied) (court does not consider pleadings or argument as evidence in reviewing grant of summary judgment).[11]

---

[11] Moreover, Appellants have not cited any authority to suggest that it is inappropriate for a governmental entity to offer incentives to private parties in order to entice them into signing a lease agreement for the construction of a project

16

Accordingly, we conclude that the City's discovery response did not raise a material question of fact on the issue of whether the City's lease with EP Vida included a reasonable fee.

### *Evidence Comparing the EP Vida Lease to Other Airport Hotel Leases*

Appellants next rely heavily on the summary judgment evidence it presented in an attempt to establish that the City did not structure the rental obligations in the EP Vida Lease in the same manner that it did in other leases to hotels located on City property adjacent to the airport. Appellants argue that the City's alleged deviation from its prior practices or policies in structuring rental obligations rendered the rental structure in the EP Vida Lease unreasonable.

Appellants identify at least two areas in which they believe the City provided EP Vida with "rental abatements" in the First Amended Lease, which were not included in the City's other airport hotel leases. First, Appellants point to the deposition testimony of the City's current Director of Aviation, Monica Lombrana, in which she testified that the City has a "general policy" of setting MAG rent in its airport hotel leases at eight percent of the appraised value of the property, but that the City made the determination to set MAG rent at seven percent of the appraised value of the property in the EP Vida Lease until the year 2028, as part of the incentive package offered

---

that would benefit the municipality. To the contrary, we note that commentators have recognized that it is a common practice for governmental entities to offer "economic incentives" as a means of attracting corporations to develop projects within their purview in the hope of stimulating local growth and ensuring prosperity. *See, e.g.*, Martin E. Gold, *Economic Development Projects: A Perspective,* 19 Urb. Law. 193, 193 (1987) (listing real property exemptions, low-interest loans, loan guarantees, grants, sales-tax exemptions, reduced energy costs, tax-exempt bond financing, and subsidized rent as programs that state and local governments use to induce private industry to relocate); *see also The Political Economy of Co-Financing America's Urban Renaissance*, 40 Vand. L. Rev. 67, 70 (1987) (recognizing that a city's redevelopment plan may include providing assistance to private developers). In addition, we note that at least one Texas court has recognized that the inclusion of temporary rental abatements in a lease does not cause it to fail for inadequate consideration, when the contract, when viewed as a whole, otherwise contains adequate consideration. *See, e.g., Dupree v. Boniuk Interests, Ltd.*, 472 S.W.3d 355, 368–69 (Tex. App.--Houston [1st Dist.] 2015, no pet.) (holding that despite temporary rental abatements in an amended twenty-four-month lease, the lease was supported by adequate consideration when viewed as a whole, and was therefore enforceable).

to EP Vida, at which time the rent would be raised to the eight percent level of the then fair market value of the Hotel Site.[12]

Second, Appellants point out that EP Vida was not required to begin paying any percentage rent (i.e., a percentage of the revenue generated from rooms rentals, and the sale of food, beverages, and other items) until 2028, while the City "customarily" required its other airport hotel tenants to immediately begin paying the greater of either the MAG rent or percentage rent, with no similar abatement.[13]  In support of their argument, Appellants refer to several affidavits that they attached to their summary judgment response, which were provided by four individuals who either own and/or operate airport hotels located on property leased from the City, all of whom averred that their leases were structured differently than the EP Vida leases.[14]  In each of their affidavits, the hotel owner/operators averred, using virtually identical language, that they had all been in the hotel business in El Paso for a certain number of years, that they had leases with the City to operate airport hotels, and that they had reviewed other leases that the City had with hotels located on airport property.  They averred that the City's other airport hotel lease agreements did not contain

---

[12] In her deposition, Lombrana explained that the City hires third-party appraisers to determine the fair market value of the land.  It is unclear from the record whether the City's decision to charge EP Vida 0.49 cents a square foot for MAG rent in the initial years of the lease corresponded to seven percent of fair market value.

[13] The rental revenue provision in most of the other airport leases is calculated on the same percentages as those set forth in the EP Vida Lease.

[14] Joe Wardy, the part-owner and operator of the Guesthouse Suites, also stated in his affidavit that he had been Mayor of the City of El Paso, and that he was familiar with the City's leasing practices based on his experience in both capacities.  He averred that, in his experience, the City had "always required lessees of airport hotel property to pay market rent in the form of fixed ground rent based on appraised value and percentage rent, or just percentage rent, without any abatement," and went on to express his opinion that in the EP Vida Lease, the City was "not receiving fair market rent as is the case with all other City leases of hotel property," and that the "rent being paid by EP Vida is not reasonable[.]"  We note there is no basis given to support the assertion that the city "always" required certain lease terms and former Mayor Wardy served in office from 2003 until 2005. Robert Gray, *Joe Wardy, CEO, Hub of Human Innovation,* EL PASO, INC. (JULY 25, 2016), http://www.elpasoinc.com/news/q_and_a/article_e6f84542-5281-11e6-ae6d-b3286b9d1847.html.

any rental abatements, and concluded that the EP Vida Lease was therefore "not reasonable because it is not based on the criteria used by the City for all other hotel leases close to or adjacent to the El Paso International Airport." Appellants' argument that the EP Vida Lease must fail due to these perceived differences between the EP Vida Lease and other airport hotel leases is flawed in several respects.

First, we note that Appellant's own summary judgment evidence actually established that the City has structured rental obligations in airport hotel leases in a variety of ways over the years, and that the City has included what were in effect, "rental abatements" in many of these other leases. In particular, we note that Appellants proffered copies of at least four other leases that the City currently has with other airport hotels, which reveal that the City structured rent in those leases in a variety of ways, and has offered a variety of "offsets" and rent "deletions" that appear to function as rental abatements to those lessees.[15] In addition, the City's current Director of Aviation, Monica Lombrana, testified during her deposition that the City has abated rent in other

---

[15] For example, in an amended lease agreement between the City and the Wyndham airport hotel dated 1987, the lease provided that Wyndham was entitled to an "offset" of rent beginning on the first day of September 1987, i.e., the first effective day of the lease, in the amount of $51,628.92, and that Wyndham was not required to pay rent until that amount had been "offset against [the] rent." The Wyndham lease also provided that "simultaneously with the execution hereof, Lessor shall pay to Lessee an additional sum of $107,544.32 representing repayment of amounts paid by Lessee to Lessor during the construction of improvements on the Leased Premises, including accrued interest at the rate of 7.5% on such amounts." In addition, in an amendment to the Wyndham lease, the City agreed to "delete" the percentage rental revenue provisions for the period from August 1, 1989 to July 31, 1991, and provided that during that period of time, Wyndham was only required to pay the City the monthly base rental fee of $5,000 per month. As well, the City's lease with the Marriott airport hotel, which was signed on October 17, 1980, provided that fixed MAG rent was not to start until May 1, 1981, giving the Marriott a seven-month rental abatement. Moreover, although that lease provided that Marriott was required to start paying revenue percentage rent to the City on the "Opening Date" of the hotel, the lease agreement effectively abated that rental provision in years in which the percentage rent exceeded the "maximum" rent set by the lease. As well, the City's lease with the Microtel hotel, dated April of 1998, provided Microtel with a one-year abatement of the percentage revenue rent to be paid to the City, and more importantly provided for a "rental offset" in the total amount of $28,500, starting in October of 1998 and ending in September of 1999, during which time Microtel was not required to pay any rent to the City.

19

leases as well. Thus, the record actually belies Appellants' contention that the City has never offered rental abatements to any of the airport hotels.

Second, although the summary judgment evidence presented by Appellants established that the City did in fact structure the rental obligations in a manner that deviated somewhat from its other airport hotel leases, these differences do not raise a fact question regarding whether the EP Vida Lease complied with the City Charter's "reasonable fee" requirement. As set forth above, the City Charter does not require the City to set leases in an exact manner in all instances, and does not obligate the City to use the same formulas in structuring leases in all cases; as set forth above, the City Charter only requires the City to assess a "reasonable fee" when leasing property—a fee that can obviously vary depending on the varying circumstances presented in any given situation.

Moreover, we also do not believe that the opinions expressed by the hotel owner/operators in their affidavits raised a fact question on the issue of whether the City's inclusion of rental abatements in the EP Vida Lease violated the City Charter. As set forth above, the hotel owner/operators opined that the City's decision to provide EP Vida with rental abatements, which were not included in their leases, was not only unreasonable, but also meant that the rent set in the EP Vida Lease was below "fair market rent." The opinions expressed by the affiants, however, were conclusory in nature and affiants provided no facts to indicate what "fair market rent" was for the subject property at the time the City entered into the EP Vida Lease in 2015, or how the City may have deviated from the property's current fair market value in setting rent in the lease. Significantly, we note that the other airport hotel leases that the affiants used in their comparisons to the EP Vida Lease were originally entered into years, and, in some instances, even decades ago, as early as the 1980's in some instances. Yet the affiants failed to provide any explanation of

20

whether market conditions were the same when the various leases were signed, and no explanation of why it would be unreasonable for a City to change its method of setting rent in leases over the course of more than three decades later. Further, the Affiants failed to account for the fact that the EP Vida Lease, unlike the other airport hotel leases, imposed different, more burdensome, requirements on EP Vida, by expressly requiring EP Vida to construct and maintain El Paso's first four-star hotel, together with a large retail center, an open-air space, and a private road.

Although we express no opinion regarding whether the hotel operators could be considered "experts" in the field of leasing practices and/or whether they could have provided an opinion regarding the value of the subject property, we note that even expert witnesses must provide a satisfactory explanation or basis for their opinions in an affidavit in order for their affidavits to be considered competent summary judgment evidence. *See McIntyre v. Ramirez,* 109 S.W.3d 741, 750 (Tex. 2003); *see also Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex. 1996) (per curiam) ("The relevant standard for an expert's affidavit opposing a motion for summary judgment is whether it presents some probative evidence of the facts at issue. Conclusory affidavits are not enough to raise fact issues."). In the present case, the affiants' opinion that the EP Vida Lease was below fair market rent, were conclusory in nature, without reference to any supporting facts, and therefore cannot be considered competent summary judgment evidence. *See generally Hovorka v. Cmty. Health Sys., Inc.,* 262 S.W.3d 503, 511-12 (Tex. App.--El Paso 2008, no pet.) (a conclusory statement in an affidavit is one that does not provide the underlying facts, or rationale, to support the affiant's conclusion, and does not constitute competent summary judgment evidence); *see also Ragland v. BNSF Ry. Co.,* 501 S.W.3d 761, 779–80 (Tex. App.--El Paso 2016, no pet.) (recognizing the principle that conclusory statements in summary judgment affidavits do

21

not raise fact issues); *Rockwall Commons Associates, Ltd. v. MRC Mortg. Grantor Trust I*, 331 S.W.3d 500, 512 (Tex. App.--El Paso 2010, no pet.) (conclusory statements are not susceptible to being readily controverted, and therefore do not constitute credible summary judgment evidence).

Accordingly, we conclude that the evidence in question established, at most, that there were differences in the various airport hotel leases, but did not carry Appellant's burden to raise a question of fact on the issue of whether the rental obligations in the EP Vida Lease violated the City Charter's "reasonable fee" requirement.

### *Evidence Pertaining to the City Council Presentation*

In their final argument, Appellants point to evidence that the City Council members may not have been properly informed of the true nature of the EP Vida Lease when they approved the lease, and argue that this raises a factual question regarding whether the lease contained a "reasonable fee" as required by the City Charter. In particular, Appellants point to the "Summary Form" that was prepared by Lombrana and presented to the City Council when it approved the EP Vida Lease, which described the nature of the lease itself, but did not explain how the lease deviated from the City's "general policy" in setting airport leases, and did not warn the Council that the lease was based on Lombrana's "entirely speculative prediction" that the City would recoup "the loss of rent income due to the abatements and the reduced MAG" in the lease. Appellants also find it significant that during her deposition, Lombrana testified that she could not recall if she made a presentation to the City Council to explain to the Council the nature of the incentives that were being offered to EP Vida or how those incentives "would work." Appellants contend that this is because the City Council may not have been fully informed of all the facts surrounding the decision to enter into the EP Vida Lease, and this raised a fact question regarding

22

whether the lease itself was "reasonable" and/or whether the City Council acted in an "ultra vires" manner in approving the lease. There are several flaws in Appellants' argument.

First, the term "ultra vires" refers to an exception to the doctrine of sovereign immunity, and exists when a government official acts "without legal authority," by either exceeding the "bounds of his granted authority," or by engaging in acts that "conflict with the law itself." *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (citing *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016)). Although the parties do not address the issue of sovereign immunity in this appeal, we note that Appellants only argument that the City Council members acted in an "ultra vires" manner is that they voted to approve a lease that violated the City Charter due to its alleged lack of a reasonable fee. The question of what the City Council knew or did not know when they voted to approve the lease has no bearing on the validity of the lease; the lease either contains a reasonable fee or it does not. Therefore, regardless of whether the City Council members had full knowledge of the rationale behind entering into the lease, this would not render their actions in voting on the lease "ultra vires."

Moreover, Appellants presented no evidence to support their purely speculative argument that the City Council members did not have all relevant information before them when they voted to approve the lease, or that the City Council members were in any way misled on the nature of the lease; in fact, the unrebutted evidence in the record belies this argument. We note that the Summary Form that was presented to the City Council in support of the Original Lease contained *all* of the lease terms that were being offered to EP Vida, and expressly stated that the lease contained the rental abatements in question. In addition, we note that Lombrana testified that although she could not recall if she was the person who "stood at the podium" and presented the

23

lease to the City Council, she was certain that the decision to "use incentives" was formally presented and explained to the Council.

And finally, we note that Appellants' argument that the City Council members acted in an ultra vires manner in voting on the lease is wholly dependent on a showing that the lease violated the City Charter. As we have already concluded that Appellants failed to raise a question of fact on the issue of whether the lease violated the Charter, we must necessarily conclude that they also failed to raise a question of fact on the issue of whether the City Council members acted in an ultra vires manner by voting to approve the lease.

## CONCLUSION

Appellants bore the burden of coming forward with more than a scintilla of evidence to raise a question of fact on their claim that the EP Vida Lease did not meet the City Charter's "reasonable fee" requirement, i.e., that the rental obligations set forth in the lease were grossly inadequate, yet none of Appellants' summary judgment evidence supported that claim. Instead, virtually all of Appellants' evidence centered solely on the question of whether the EP Vida Lease used a formula essentially the same as other existing airport hotel leases—a requirement that is simply not found in the City Charter. We therefore conclude that Appellants did not meet their burden of establishing a question of fact on whether the EP Vida Lease violated the City Charter, or a question of fact on whether the City Council members acted in an ultra vires manner in their approval of the lease. We therefore overrule all of Appellants' issues as set forth in their brief, and affirm the trial court's entry of summary judgment in favor of the City and EP Vida.[16]

---

[16] In its brief, Appellants do not provide any argument expressly addressing the question of whether the trial court properly granted summary judgment on the City's counterclaims, seeking a declaration that the lease was valid and enforceable. However, these questions are inextricably related--if Appellants did not raise a question of fact to support an argument that the lease violated the City Charter, then they necessarily failed to raise a question of fact to

GINA M. PALAFOX, Justice

August 4, 2017

Before McClure, C.J., Rodriguez, and Palafox, JJ.

---

contest the validity of the lease. Therefore, we conclude that it was proper for the trial court to enter summary judgment dismissing Appellants' claims against the City, as well as summary judgment on the City's counterclaims.